## PEOPLE *v.* BLOOM

1. CRIMINAL LAW — TRIAL — JURY SELECTION — PEREMPTORY CHALLENGES — NUMBER ALLOWED.

   Defense in criminal trial involving a number of defendants was properly limited during selection of the jury to a total of five peremptory challenges for each defendant instead of five challenges per count charged for each defendant (CL 1948, § 768.12).

2. SAME—TRIAL—JURY SELECTION—CHALLENGES FOR CAUSE—PUBLICITY OF CASE.

   Proposal that the scope of the challenge for cause be expanded to permit such a challenge to any juror who has gained a substantial degree of knowledge about the case through pretrial publicity even if the juror swears that he can render an impartial verdict is rejected in a case where a *substantial* degree of foreknowledge is not shown.

3. SAME—TRIAL—JURY—PREJUDICE—EVIDENCE—BURDEN OF PERSUASION—PRETRIAL PUBLICITY.

   Defendants in a criminal case are entitled to an impartial jury, but they have the burden of persuading that there was in fact prejudice from pretrial publicity.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur, Jury § 234.
[2] 31 Am Jur, Jury §§ 146, 147, 171, 175.
[3–5] 21 Am Jur 2d, Criminal Law § 236; 53 Am Jur, Trial § 36.

4. SAME—TRIAL—JURY—PREJUDICE—EVIDENCE—BURDEN OF PERSUA-
SION—PRETRIAL PUBLICITY.

   Defendants in a criminal case need not show identifiable jury
   prejudice resulting from pretrial publicity where the atmos-
   phere surrounding the proceedings creates a high probability
   of prejudice and is thus inherently lacking in due process.

5. SAME—TRIAL—JURY—PREJUDICE—PRETRIAL PUBLICITY.

   Extensive and sensational news coverage of defendants' case
   *held,* not to have denied them a fair trial where they did not
   allege or prove actual jury prejudice, defendants' motion
   for a change of venue was granted, the trial judge liberally
   excused jurors who expressed *misgivings about their ability*
   *to be impartial,* and the jury was repeatedly advised by the
   court during the trial to avoid the news media.

Appeal from Oakland, Ziem (Frederick C.), J.
Submitted Division 2 November 7, 1968, at Lansing.
(Docket No. 4,322.)   Decided January 9, 1969.   Re-
hearing denied March 7, 1969.   Leave to appeal
denied July 22, 1969.   See 382 Mich 770.

Harvey Bloom, Frank Bommarito, Matt Bom-
marito, Joseph Brooklier, Henry Cantinella, Ed-
ward Guarrella, Joseph Guarrella, Paul David Ja-
cobs, Robert Johns, Sebastian Lucido, Joseph Mi-
chael Niznik, Joseph G. Nardicchio, Joseph Norman,
Sam Pagano, Michael Thomas Pulcini, Anthony J.
Pallazzolo, John Louis Snyder, Theodore J. Todd,
Frank Joseph Vettesse and Michael C. Vermigilio
were convicted of conspiracy to violate and violation
of the State gaming laws.   Defendants appeal.   Af-
firmed.

*Frank J. Kelley,* Attorney General, *Robert A.*
*Derengoski,* Solicitor General, *S. Jerome Bronson,*
Prosecuting Attorney, and *Dennis Donohue,* Chief
Appellate Counsel, and *Thomas Plunkett,* Chief As-
sistant Prosecutor, for the people.

*Carlton S. Roeser,* for defendants.

*Amicus Curiae:* Metropolitan Detroit Branch, American Civil Liberties Union (by *Arthur Lombard,* of New York).

McGREGOR, P. J.   Defendants appeal their conviction for conspiracy to violate and for violation of the state gaming laws.[1]   The jury's verdict of guilty was the culmination of a controversy whose first episode was a gambling raid of a suspect establishment in October, 1963, in which the twenty-one defendants were arrested.   Extensive coverage of the raid by the communications media continued after the arrest, and after defendants' motion, the venue was changed from Oakland to Manistee county in May, 1965.   On July 22, 1965, the jury selection began before the circuit judge, who excluded approximately 65 prospective jurors, basically because of settled opinions derived from news reports.

Defendants requested five peremptory challenges for each charge; however, the court granted five challenges per defendant, and all were exercised. Virtually every prospective juror gained some knowledge of the case through the news media, but after the jury was empanelled, defendants' challenge of the array on grounds of prejudicial pretrial publicity was unsuccessful.   During the *voir dire* and the trial, the court repeatedly cautioned the jurors not to read of, listen to, or discuss aspects of the case, and to make their decision solely from the testimony and evidence submitted.   The panel chosen voiced the traditional oath of freedom from prejudice plus the ability to reach a just verdict solely on the evidence, and the jury was not seques-

---

[1] CL 1948, §§ 750.301–750.303, 750.505 (Stat Ann 1954 Rev §§ 28-.533–28.535, 28.773).

tered. News coverage continued through the trial and defendants were found guilty on August 10, 1965.

The issues raised on appeal are: (1) whether defendants were entitled to five peremptory challenges per individual, or per count charged; (2) whether the widespread publicity of the proceedings, from arrest through trial, effectively denied the defendants an impartial jury and a fair trial, as guaranteed by the 14th amendment; and (3) whether the trial proceedings were fair, impartial and orderly, thus affording defendants due process of law.

I.

The trial judge correctly resolved the first issue by granting five peremptory challenges for each defendant. The contention that each defendant was entitled to five challenges for each count charged is unsupported by relevant authority. The language cited by defendants from *People* v. *Sweeney* (1885), 55 Mich 586, 589, placed in context, states that where an accused was charged with counts of unequal severity, and the greater charge entitled him to more than the customary five peremptory challenges, he was entitled to the larger number of challenges, even though convicted for the lesser charge. The applicable statute states that:

"Any person who is put on trial for an offense which is not punishable by death or life imprisonment, shall be allowed to challenge peremptorily 5 of the persons drawn to serve as jurors and no more; * * * In cases involving 2 or more defendants who are being jointly tried for such an offense, each of said defendants shall be allowed to challenge peremptorily 5 persons returned as jurors and no more;" CL 1948, § 768.12 (Stat Ann 1954 Rev § 28.1035).

The offenses charged do not carry penalties entitling defendants to more than five peremptory challenges, and therefore, we affirm the lower court on this issue.

## II.

The second issue raised is whether the extensive publicity effected prejudice and thereby denied defendants an impartial jury and a fair trial. The effect of extensive publicity on a trial's fairness has been a studied subject in recent years, as indicated by the proposed standards of the American Bar Association in the Reardon Report. The metropolitan Detroit branch of the American Civil Liberties Union expressed its interest in the evolving Michigan law on this issue by submitting an *amicus curiae* brief in the present appeal.

Without question, the media gave extensive news coverage to the present controversy, and characteristically indulged in some degree of sensationalism. Testimony before a Senate investigation subcommittee, in which several names were listed as members of the Detroit Mafia organization, was heard the day preceding the arrest; three of the 48 persons arrested in the gambling raid were on the list. Michigan news media saturated the state with accounts of the hearing, the list, and the gambling raid the next day. The press freely and imaginatively characterized the suspect establishment as, for example, a "huge gambling operation frequented by hoodlums." Accepting the thoroughness of the news services, we assume that each juror at the empanelling stage had some previous knowledge of the case.

The ACLU argues that since the present challenge system does not eliminate jurors who have read or seen prejudicial publicity who nevertheless

swear to impartiality, it does not insure an objective jury. They propose that the scope of the traditional challenge for cause be expanded to permit the challenge of any juror who has gained a substantial degree of knowledge about a case from pretrial publicity. However, we are not prepared to add substance to the phrase "substantial degree of knowledge about a case from pretrial publicity," as applied to the present matter. Although we assume that each juror had foreknowledge, we do not assume that his knowledge was "substantial." Therefore, we reject the ACLU proposal.

The essence of defendants' arguments is that they were denied due process through the deprivation of a fair trial and an impartial jury, resulting from the "massive", "pervasive", "notorious", "sensational", "tendentious", and "prejudicial" publicity attending the various stages of the controversy, citing numerous cases. They claim that the news media engendered prejudice and passion, which fostered a partial verdict and denied defendants a fair trial, as guaranteed by the due process clause of the 14th amendment.

Plaintiff contends that, although defendants are constitutionally entitled to an impartial jury, they have the burden of proving prejudice from pretrial publicity. *Stroble* v. *California* (1952), 343 US 181 (72 S Ct 599, 96 L Ed 872). Also, the convictions overturned in recent cases are factually distinguishable from the present appeal. The decisional basis in *Irvin* v. *Dowd* (1961), 366 US 717 (81 S Ct 1639, 6 L Ed 2d 751) was prejudicial publicity, which denied a fair and impartial jury, but actual prejudice was shown by the admission by eight jurors of pretrial belief in defendant's guilt. In *Marshall* v. *United States* (1959), 360 US 310 (79 S Ct 1171, 3 L Ed 2d 1250) prejudice was occasioned by news-

paper accounts of inadmissible evidence which reached the jurors. In *Rideau* v. *Louisiana* (1963), 373 US 723 (83 S Ct 1417, 10 L Ed 2d 663) three jurors admitted viewing a televised confession. Plaintiff states that in the present controversy, defendants do not allege that any juror contravened his sworn oath and admitted a predetermined opinion of defendants' guilt, or that inadmissible evidence or confessions reached the jurors during the proceedings via the communications media. Plaintiff claims, therefore, that no actual prejudice was shown, particularly if the facts are viewed according to the tenor of the following:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin* v. *Dowd, supra,* p 722.

Plaintiff concedes, however, that proof of identifiable prejudice need not be shown where the atmosphere of the proceedings creates a high probability of prejudice and thus is inherently lacking in due process, as indicated by the celebrated cases of *Estes* v. *Texas* (1965), 381 US 532 (85 S Ct 1628, 14 L Ed 2d 543) and *Sheppard* v. *Maxwell* (1966), 384 US 333 (86 S Ct 1507, 16 L Ed 2d 600). But plaintiff explains that there was neither the courtroom intrusion of *Estes,* nor the carnival atmosphere of *Sheppard* in the present matter. Moreover, the record depicts an earnest attempt by the trial judge to establish and maintain an impartial tribunal through juror dismissal and admonition, a fact that defendants' counsel acknowledged and applauded during

the trial. Also, the venue was changed on defendants' motion. Consequently, plaintiff reduces defendants' contentions to a claim that the considerable publicity involved in their arrest and trial was sufficient to deprive them of a constitutionally guaranteed fair trial. In conclusion, plaintiff submits that extensive publicity does not constitute, *per se,* reversible error.

We note that defendants did not allege or prove actual jury prejudice, and the court liberally excused jurors who expressed opinions as to whether the publicity would influence the verdict. Therefore, the scope of our inquiry is narrowed to whether the extensive news coverage substantially affected the proceedings and thus, a fair and impartial trial was precluded. We find that defendants were not prejudiced by publicity and received a fair trial. Our decision is based on the fact that defendants did not demonstrate sufficient community prejudice or hostility, as established by media publicity, from which a significant probability of jury prejudice or predisposition could be inferred.

In reaching our decision, we surveyed the character and content of approximately four hundred articles offered as evidence of prejudicial publicity. Approximately 7% concerned the 1963 Senate hearings. About one-third of the remainder were post-arrest articles primarily aimed at the female spy aspect of the case and focused on the principal witness. Another one-third were newspaper accounts of the trial, and the remaining third were published after the trial was completed. Since identifiable prejudice by the jury was not alleged, we assume that the court's recurrent jury admonitions were heeded and that the jury prudently refrained from media indulgence during the trial. Thus we are concerned essentially with articles appearing before

or during the jury empanelling. The dates and sources of the submitted articles indicate that approximately 10 to 15 % were conceivably viewed by the jury array, and most of these appeared immediately following the arrest, in October, 1963. The *voir dire* commenced in July, 1965, 21 months later. Considering the venue of Manistee, the many dismissals of potential jurors by both peremptory challenges and on the court's own motion, and the nature and number of the articles available before and during the *voir dire,* we cannot conclude that the publicity submitted establishes a substantial probability of jury prejudice or predisposition.

Most of the articles that appeared around the time of the arrest contained characterizations of the establishment raided as a large-scale gambling operation. Defendants admit gambling, but contend that their activities were informal and not in violation of gaming statutes. Thus, pretrial media characterization as "gamblers" could not substantially prejudice defendants, who admit that the classification of "gambler" is appropriate, but contest the connotation of professional rather than informal as well as their alleged degree of indulgence in gambling.

*Sheppard* v. *Maxwell, supra,* a landmark decision on the issue of prejudicial publicity, held that due process requires a fair trial, free from prejudicial outside influences, and that massive, pervasive, pretrial publicity, prejudicial in nature, will be grounds for reversal. Although we have assumed that each juror had some knowledge of the events leading to the *voir dire* examination, we do not believe the amount and nature of the probable knowledge indicates a reversal under the *Sheppard* holding. The venue was changed to a locale away from the area from which most of the publicity originated, and the court was circumspect in its admonitions to

prospective and actual jurors. As previously noted, the tag of "gambler" was not particularly prejudicial to the defendants, according to the tenor of their contentions. It cannot be said with reason that the pretrial publicity was massive or pervasive in the trial locale. The atmosphere, primarily resulting from the publicity and court control, that existed in the present case is clearly not of the *genre* intended to be eliminated by the *Sheppard* decision, which, therefore, does not impel a reversal.

In a recent decision of this Court, concerning a similar fact situation, we held that a pattern of deep and bitter community prejudice must be present and shown in order to demonstrate an abuse of discretion by the trial judge in refusing to grant a change of venue, despite prior jury knowledge of the case gained through the news media. The following excerpt from that decision is offered as pertinent to the present controversy:

"Jurors who have heard of or have read of the case, without more, are not disqualified as jurors, and their inclusion does not deny defendant a fair trial. See *People* v. *Quimby* (1903), 134 Mich 625; *People* v. *Schneider* (1944), 309 Mich 158; *People* v. *Dailey, supra*. A juror who has formed an opinion may not be challenged for cause, providing the opinion is not positive in character, and he may render an impartial verdict. CL 1948, § 768.10 (Stat Ann 1958 Rev § 28.1033). In this case, all jurors who sat stated that they had no fixed opinion as to the guilt or innocence of the accused and that they could render a fair and impartial verdict.

"Counsel refers us to a decision on due process of law as provided by the 14th Amendment, regarding a fair trial, as binding on our determinations in this matter. It is true that a trial judge may not allow the press to interfere with the course of trial or allow the decision to be based on extraneous pub-

licity. *Sheppard* v. *Maxwell* (1966), 384 US 333 (86 S Ct 1507, 16 L Ed 2d 600). This situation, however, is not alleged to be present in this case. We deal with the problem of prior information and community feeling as affecting a defendant's right to a fair trial. We are referred to and examine in detail the decision of *Irvin* v. *Dowd* (1961), 366 US 717 (81 S Ct 1639, 6 L Ed 2d 751), and regard it as controlling. In American and Anglo-Saxon jurisprudence there is the invaluable right to jury. It must be a panel of impartial jurors. There must be a fair tribunal which renders a verdict on evidence presented at trial for a proceeding to meet the minimum standards of due process. It is not necessary that they be without impression or opinion. They must, however, be able to lay aside their impressions and base their verdict on the evidence. Where there is strong community feeling and a pattern of deep and bitter prejudice in the community, the influence of that opinion makes a strong impression, nearly impossible to detach from the mental processes of the average man. Trial under such influence denies due process. The burden of showing the existence of these conditions is on the challenger.

"The defense has shown that there were newspaper articles and that some of the jurors had read or heard of the case. This showing, without more, is not sufficient. Defense presents no evidence of a strong community feeling. The trial judge in the community has his senses and personal knowledge of the community to detect this community feeling. An appellate court has only the cold record upon which to rely." *People* v. *Jenkins* (1968), 10 Mich App 257, 261, 262.

We find that defendants did not establish community prejudice which influenced the *voir dire* or the trial against them. Similarly, defendants did not meet their burden of proving a strong community feeling of prejudgment that could make a sufficiently strong impression to possibly influence the

decision of an average man, and thus deny defendants their right to due process of law.    Therefore, we hold that the defendants were not prejudiced by the publicity attending their arrest and trial.

## III.

The third issue raised is whether defendants received a fair and impartial trial.    They contend that they were deprived of the fundamental fairness essential to our concept of justice by numerous rulings of an unintentionally prejudiced trial court and by prosecutorial misconduct.    An examination of the record discloses that no reversible error was committed by the court, and reveals that many of defendants' allegations are factually incorrect.    Few errors are supported by relevant authority, other than broad statements of judicial philosophy.    Defendants, however, concede that many of the alleged errors, individually, would not constitute prejudicial error, but claim the cumulative effect of the errors indicates judicial partiality, thus requiring a new trial, citing *United States* v. *Guglielmini* (CA 2, 1967), 384 F2d 602.    The record indicates that the trial judge made earnest efforts to retain an air of impartiality throughout the lengthy trial and consequently, we cannot conclude that the jury was impressed with the trial judge's partiality either for or against the defendants to an extent that it became a factor in their determination.    Also, the record does not disclose prosecutorial conduct substantially prejudicial to defendants, although counsel for both parties were arguably less than professional in their behavior.

Due process of law has remained an imprecise and metaphysical concept, but its essence has been described as follows:

"Due process of law, as a historic and generative principle, precludes defining, thereby confining, the standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice'." *Rochin* v. *California* (1952), 342 US 165, 173 (72 S Ct 205, 96 L Ed 183).

We are convinced that under the attendant circumstances, defendants' convictions were not brought about by methods, specifically an unfair trial, that offended a "sense of justice"; therefore, their convictions did not violate due process of law.

Convictions affirmed.

QUINN and LETTS, JJ., concurred.