# PEOPLE v. ROLLINS

1. CRIMINAL LAW—JOINT TRIALS—NONTESTIFYING CODEFENDANT.

    The introduction, at a defendant's and his nontestifying codefendant's joint trial of a statement of the codefendant, which incriminates the defendant, violates the defendant's right to confront his accuser and to cross-examine his accuser; a judge's instruction to the jury to disregard the statement when determining the defendant's guilt is not sufficient to cure the error.

2. CRIMINAL LAW—JOINT TRIAL—NONTESTIFYING CODEFENDANT—CODEFENDANT'S STATEMENT—CONSTITUTIONAL LAW.

    The United States Supreme Court decision that the introduction at a defendant's and his nontestifying codefendant's joint trial of a statement of the codefendant, which incriminates the defendant, violates the defendant's right to confront his accuser and to cross-examine his accuser and that an instruction to the jury to disregard the confession when determining the defendant's guilt is not sufficient to cure the error applies to the states and is retroactive.

3. CONSTITUTIONAL LAW—CONSTITUTIONAL RIGHT—DENIAL OF RIGHT—HARMLESS ERROR—STANDARD.

    The standard for determining whether the denial of a Federal constitutional right was harmless is whether the reviewing court can declare that the denial was harmless beyond a reasonable doubt.

4. CONSTITUTIONAL LAW—CRIMINAL LAW—CONSTITUTIONAL RIGHT—DENIAL OF RIGHT—HARMLESS ERROR—STANDARD.

    The "beyond a reasonable doubt" standard for determining the harmlessness of the denial of a Federal constitutional right can also be phrased as to ask the reviewing court to decide

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5]  21 Am Jur 2d, Criminal Law § 333 *et seq*.
  23 Am Jur 2d, Depositions and Discovery § 120.
  30 Am Jur 2d Evidence §§ 1151, 1152.
[3, 4]  5 Am Jur 2d, Appeal and Error § 798.
  16 Am Jur 2d, Constitutional Law §§ 172, 175.
[6]  29 Am Jur 2d, Evidence § 638 *et seq*.

(1)

that there was no reasonable possibility that the evidence complained of might have contributed to the defendant's conviction.

5. HOMICIDE—FIRST-DEGREE MURDER—JOINT TRIAL—NONTESTIFYING CODEFENDANT—CODEFENDANT'S STATEMENT—CONSTITUTIONAL LAW.

A statement of defendant's nontestifying codefendant admitted to in their joint trial for first-degree murder that when they decided to return to where the murder victim and his brother were standing, the defendant said that he was going to try to kill one of them contributed to defendant's first-degree murder conviction and thus, the statement's admission was not harmless beyond a reasonable doubt and the evidence showed that the defendant and his companions had taken tire irons from their car's trunk and placed them in the car, before leaving a fairgrounds, that on the way from the fairgrounds they saw the victim and offered him a ride, but were allegedly insulted by him, that after driving a little further, they decided to return to the victim, that the defendant said that he wanted to go back to find out what was wrong, that, according to a police officer, the defendant had said that he went back because he wanted to teach the victim a lesson, that the defendant struck the victim with a tire iron, and that the victim died of that injury, because the codefendant's statement was the only direct evidence of premeditation and deliberation.

6. CRIMINAL LAW—EVIDENCE—SILENCE—EVIDENCE OF GUILT.

An accused person's silence in face of an accusation may not be used against him as a tacit admission of the truth of the accusation.

Appeal from Recorder's Court of Detroit, Gerald W. Groat, J. Submitted Division 1 March 8, 1971, at Detroit. (Docket No. 6516.) Decided April 26, 1971. Leave to appeal denied August 12, 1971. 385 Mich 780.

Tommie Rollins was convicted of first-degree murder. Defendant appeals by leave granted. Reversed.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *William L. Cahalan*,

Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Leonard Meyers,* Assistant Prosecuting Attorney, for the people.

*Robert F. Mitchell, Jr.,* for defendant on appeal.

Before: DANHOF, P. J., and McGREGOR and LEVIN, JJ.

LEVIN, J. The question presented is whether on the facts in this record the admission in evidence at the defendant's pre-*Bruton* trial of the confessional statement of a nontestifying codefendant was harmless beyond a reasonable doubt. We conclude that it was not harmless and grant a new trial.

## I.

Tommie Rollins appeals his conviction of first-degree murder on leave granted by the Supreme Court of Michigan and its referral of his appeal to our Court for determination as on grant by our Court. The order of the Supreme Court directed that our review include consideration of whether Rollins' "constitutional right of confrontation and cross-examination was violated by the admission at a joint trial of the statements of his codefendants implicating him made to the police not in the defendant's presence". *People* v. *Rollins* (1970), 383 Mich 766.

At Rollins' trial in February 1957, formal statements which two codefendants had given to assistant prosecuting attorneys were read into evidence over the objection of Rollins' attorney. The court instructed the jurors that they were to consider the statements only in deciding the guilt or innocence of the declarant. While Rollins testified at the trial, his codefendants did not.

## II.

· In *Bruton* v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476), the United States Supreme Court held that the introduction of a confession of a codefendant who did not testify at the joint trial of Bruton and the nontestifying codefendant violated Bruton's Sixth Amendment right to confront and to have the opportunity to cross-examine his accusers and that this encroachment was not cured by the judge's instructions that the jury should disregard the confession as to Bruton. The *Bruton* rule was made retroactive in both Federal and state prosecutions by *Roberts* v. *Russell* (1968), 392 US 293 (88 S Ct 1921, 20 L Ed 2d 1100).

Subsequently, the Supreme Court of Michigan and our Court reversed pre-*Bruton* convictions of first-degree murder on the authority of *Bruton* and *Russell* because the statement of a nontestifying codefendant had been read at the appealing defendant's trial.[1]

Plainly, Rollins' constitutional right of confrontation, as elucidated in *Bruton,* was violated when the

---

[1] *People* v. *Shirk* (1970), 383 Mich 180; *People* v. *Spells* (1969), 16 Mich App 609; *People* v. *Curley* (1968), 14 Mich App 235.

Similarly, see *People* v. *Teal* (1969), 20 Mich App 176, 179, where we said:

"We have considered *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284) and find it inapplicable to the case before us. *Harrington* just decided *Harrington* and it is not precedential authority. *Harrington* specifically reaffirms *Chapman* [v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705)]. In *Harrington,* one of three codefendant confessors testified and was cross-examined by Harrington's attorney. Several witnesses, including Harrington, placed the latter at the scene of the crime."

Contrast *People* v. *Wavie Williams* (1969), 19 Mich App 291, 293, where we concluded that *Bruton* error was harmless under *Harrington,* discussed *infra.* Williams was convicted of assault with intent to rob and steal being armed and of assault with intent to commit murder. We declared that there was "overwhelming direct evidence" which not only placed Williams at the scene of the crime but also identified him as the person who shot one of the proprietors of the store, and that the statement of Williams' codefendant was, therefore, merely cumulative and harmless error.

statements of his codefendants were read at his trial and, because they did not take the stand, he did not have an opportunity to cross-examine them.

The people contend that, even though *Bruton* was made retroactive and applicable to state court convictions by *Russell,* we should, nevertheless, affirm Rollins' conviction because the error was harmless.

In *Chapman* v. *California* (1967), 386 US 18, 24 (87 S Ct 824, 17 L Ed 2d 705), reh den 386 US 987 (87 S Ct 1283, 18 L Ed 2d 241), the United States Supreme Court ruled that the denial of a Federal constitutional right in a state court trial can be harmless and declared:

"before a Federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

The Court explained that a standard based on reasonable doubt would be a standard familiar to all courts and expressed a belief that its adoption would, therefore, prove workable. The Court said that the beyond-a-reasonable-doubt standard was directed at achieving the same results as in an earlier case where the Court had declared that "the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction".[2] There is, said the Court, little, if any, difference between that formulation and "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of *did not contribute* to the verdict obtained". (Emphasis supplied.)[3]

---

[2] *Fahy* v. *Connecticut* (1963), 375 US 85, 86, 87 (84 S Ct 229, 11 L Ed 2d 171).

[3] See *People* v. *Hutton* (1970), 21 Mich App 312, 332, where, applying Chapman, we said that we could not say on the facts in the record presented that the erroneously admitted testimony "contribute[d] to defendant's conviction".

In *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284), the Court expressly "reaffirmed" *Chapman* in stating its conclusion that a *Bruton* error was harmless. The case against Harrington was "not woven from circumstantial evidence". The evidence supplied through the confessions of the nontestifying codefendants was merely cumulative and the other evidence against Harrington was so overwhelming, said the Court, that it could properly declare its satisfaction beyond a reasonable doubt that the denial of Harrington's constitutional right was harmless.

### III.

In the present case, as will appear, the evidence added by the statements of the nontestifying codefendants was not cumulative of any other evidence; indeed, it was the only direct evidence on the central issue in the case: was the killing deliberate and premeditated? And, while there was other evidence in the case which might have justified the jury in drawing inferences favorable to the people on that central issue, the evidence supporting those inferences was not so overwhelming that we could properly declare a belief beyond a reasonable doubt that the admission of the statements did not contribute to the verdict of first-degree murder.

Rollins and his codefendants, Horace Collier and Odell Grey, were tried for the murder of Gerald Rondeau. Rollins was convicted of first-degree murder and his codefendants of second-degree murder.

Rollins was then 19 years old and both Collier and Grey were 18. The three defendants and James Craig, a 16-year-old boy who was not charged with the offense, had spent the early evening of September 4, 1956, drinking beer and whiskey.

At about 9:30 p.m. they set out in Grey's automobile for the State Fair at Woodward Avenue and Eight Mile Road, Detroit.  All four boys are black.  At the Fair they became embroiled in several arguments which led to scuffles with other young people, all of whom were white.  The extent of the fighting is unclear.

Craig testified that he was engaged in one fight and that he thought Rollins was engaged in one too.  Rollins testified that they encountered some white boys on the sidewalk and one of them bumped into him, and that he "hit" the boy when he refused to explain why he had bumped into him.

They were at the fair between 15 minutes and an hour and then returned to their automobile.  They encountered another group of four or five white boys in the parking lot.  One of the defendants decided that they should arm themselves with weapons.  The trunk of their automobile was opened and three tire irons were removed.  The argument broke off without blows being struck and the tire irons were put on the floor in front of the back seat of the automobile.  The boys then drove off from the fair grounds.

Shortly after leaving the fair, they stopped for a red light near where the victim, Gerald Rondeau, 14 years old, was standing with his brother, Donald Rondeau, who was 16, and their uncle Terry Brand, 13 years old.  These boys were white.  They were waiting on a traffic island on Woodward Avenue near Eight Mile Road for the Rondeaus' father to pick them up.

Rollins asked the boys whether they wanted a lift.  One replied, said Rollins, "none of your business, black boy".  When the light changed Rollins and his cohorts drove off, but then it was decided they would return to the scene.  A distance of 7/10ths of a mile was traveled during the turn around.

Rollins alighted from the automobile and, so he claimed, as he did so one of the tire irons fell to the street. He picked it up. Rollins asked "the fellow why he wanted to call me the name". Rollins admitted that he then struck Gerald with the tire iron. He said that he thought that Gerald had "a little old stick or something in his hand, and I thought he was getting ready to hit me". He claimed that he got out of the automobile to question the boys and did not intend to hit Gerald. "I was just trying to knock whatever he had out of his hand. I wasn't trying to hurt him." He denied that he intended to hurt or kill Gerald.

In a statement he gave to an assistant prosecutor Rollins said that after they drove away from Gerald and his companions following the first encounter they all decided to turn around and go back and "find out what's wrong" and that when they returned he stepped out of the car and said, " 'man, why do you want to call me that' I mean—I said, 'you know its wrong,' and I just hit him with the thing".

Gerald did not respond before Rollins hit him, "he started smiling" and "had his fist balled up." Rollins added, "I didn't mean to hurt him. I just wanted to give him a good lesson".

An investigating police officer testified that Rollins told him that after they drove off the first time he, Rollins, said, "Let's go back. I want to teach them a lesson". When they returned, "the boys started to run, [Rollins] said, and he swung at him once and hit him in the head, not intending to kill him, he stated, but just wanted to teach him a lesson".

Rollins was right-handed and the blow was struck to Gerald's right mastoid area from which the people asked the jury to infer that Gerald had started to run away before the blow was struck.

Rollins was 5 feet, 10-1/2 inches tall and weighed about 130 pounds. Gerald was 5 feet, 3 inches tall and weighed 85 pounds.

Donald Rondeau testified that when Rollins and his companions first drove by someone hollered out the window, "Do you want a ride?" and that he had responded, "No". In about five minutes they came back and someone again hollered, "Do you want a ride?" and he again responded, "No". Then Rollins "got out and just said, 'Are you getting smart or something?' and just hit him." Donald said that his brother made no response to Rollins before he was hit and that he had nothing in his hand other than a small box with a toy windup dog which they had purchased for a younger sister.

One blow was struck. Gerald fell to the ground, but with the assistance of his brother and under his own power he made it across the street where he complained of a headache. The police were called and Gerald was taken to the station house. There he was turned over to his parents and went home where he spent the night. He seemed all right when he retired, but the following day he became seriously ill, was operated on for the skull injury and died on September 7th.

## IV.

There was, of course, ample evidence to support a verdict of murder of the second degree. Rollins admitted that he struck Gerald with a tire iron and Gerald died as a result of the injury caused by the blow. Despite Rollins' protestations to the contrary, the jury could on that evidence find actual intent to kill or imply intent to kill.[4]

The evidence supporting an inference of premeditation and deliberation, elements necessary to in-

---

[4] *People* v. *Morrin* (1971), 31 Mich App 301, 311, 315.

crease the degree of the offense from second-degree murder to first-degree murder was, however, meager. The tire irons had been placed on the floor in front of the back seat before Rollins and his companions encountered Gerald.

Whether one accepts Rollins' claim that they turned around to find out "what was wrong", or the statements attributed to Rollins that he returned to the scene "to teach them a lesson", there is no evidence whatsoever at this point in the account that at any time during the automobile ride or before Rollins struck the one blow to Gerald's head, that he had made up his mind to kill Gerald or one of Gerald's companions or that such a decision had been deliberated upon.

Although Rollins alighted from the automobile with a potentially dangerous weapon in his hand, the evidence does not support an inference that the tire irons were placed on the floor in front of the back seat with the intent that they would be used to kill someone or that Rollins took one of the irons in hand with a premeditated and deliberated purpose, arrived at in a cool state of blood, of using it to kill someone.[5]

The people's case against Rollins was immeasurably strengthened by the reading, contrary to the subsequently enunciated *Bruton* rule, of the confessional statement of Odell Grey who said that after it was decided to turn around and go back Rollins

---

[5] The evidence does, indeed, support an inference that Rollins intended to inflict great bodily harm. Also, the jury could have justifiably concluded that the natural tendency of Rollins' behavior was to cause death or great bodily harm. But those inferences and conclusions are sufficient to support only an implication that Rollins intended to kill Gerald. Those inferences and conclusions, while adequate to support a verdict of second-degree murder (the intentional killing of one human being by another without justification, excuse or under circumstances of mitigation) are not sufficient to support a verdict of first-degree murder. *People* v. *Morrin, supra,* p 327.

said "he was going to try his best to kill one of them". Grey's statement negatived Rollins' claim that he did not intend to hurt or kill the boy. It was compelling evidence on the issue of whether Rollins had premeditated and deliberated the murder before he left the automobile.[6]

Grey's statement was mentioned by the assistant prosecuting attorney in his closing argument. He said, "we have bearing on intent the words which we claim were said, 'I am going back and try to kill that boy'".

A police officer testified that Rollins maintained silence when he was brought together with Grey and Collier and they were asked to repeat in the presence of Rollins what they had told the officer. That Grey had told the officer that Rollins had said, "Let's go back. I want to try to kill one of those boys". And that Collier told the officer that Rollins

---

[6] Grey's statement also bore on the questions of whether the blow was struck with the intent to inflict great bodily harm and of whether the natural tendency of Rollins' actions was to cause death or great bodily harm.

The judge did not instruct the jury concerning the law of implied intent. While he did say that malice may be express or implied: "malice *prepense*, or aforethought, either express or implied", that is all he said about implied malice or intent. He did not explain the kind of inferences or the kind of findings (intent to do great bodily harm or a finding that the natural tendency of the actor's behavior was to cause death or great bodily harm) necessary to support an implication of intent to kill.

The jury, by its verdict of first-degree murder, found actual intent to kill. Therefore, because of the court's failure to charge on the law of implied intent and because the evidence (*i.e.*, including Grey's statement) supported a finding of actual intent to kill and the jury found actual intent to kill, we have no basis for concluding that when the jury convicted Rollins of murdering Gerald it found from the evidence of Rollins' dangerous conduct directed at Gerald implied intent to kill.

We could not, therefore, properly declare a belief beyond a reasonable doubt that the confessional statement, inadmissible under *Bruton*, that Rollins, before striking Gerald, said he intended to kill one of the boys did not (because the jury might have implied the intent to kill from the evidence of Rollins' dangerous conduct) *contribute* to the jury's decision insofar as it constitutes a finding of second-degree murder. *Cf. People* v. *Morrin, supra,* pp 336, 337.

had said, "Let's go back. I want to get one of those boys". When he testified, Rollins conceded that he had heard Grey make the statement but claimed that Grey later told him that the police forced him to make the statement.

The people rely on Rollins' silence as evidence that he acquiesced in the truth of Grey's and Collier's statements. The rule is, however, that an accused person's silence in the face of accusation may not be used against him as a tacit admission of the truth of the accusation. In *People* v. *Bigge* (1939), 288 Mich 417, 420, the Supreme Court of Michigan reversed a conviction because the prosecutor had referred to Bigge's failure to respond to an accusation made at a conference held some time before formal charges were lodged against him. The Court declared:

"There can be no such thing as confession of guilt by silence in or out of court. The unanswered allegation by another of the guilt of a defendant is no confession of guilt on the part of a defendant. Defendant, if he heard the statement, was not morally or legally called upon to make denial or suffer his failure to do so to stand as evidence of his guilt. He said nothing, and what was said in his presence by another was inadmissible".[7]

---

[7] Similarly, see *People* v. *Gisondi* (1967), 9 Mich App 289, 294, where the defendant's conviction of first-degree murder was reversed because the people had been permitted to prove that he had remained silent in the face of accusation by a codefendant during a confrontation at the police station.

In *State* v. *Hogan* (Mo, 1923), 252 SW 387, 388, the Supreme Court of Missouri said:

"Over the objection and exception of the defendant's counsel the witness testified:

"That Pillow looked at Hogan and said: 'That was the man that threw the coat over my head and robbed me.' Hogan opened not his mouth.

"Four other officers also testified to the statement made by Pillow in the presence of the defendant. The coat was offered in evidence. It was identified by the officer by 'the initials "J. B." and the marks

Since Rollins' silence was not evidence, Grey's formal statement, not admissible against Rollins, was the only significant evidence that Rollins had decided to kill someone before he alighted from the automobile. Grey's formal statement was not cumulative of other evidence. It was the only direct evidence on the issue of intent to kill, it was the only direct evidence of premeditation and deliberation. The circumstantial evidence of intent to kill

---

on the inside, "J. B. Hogan," with the figure "6" in indelible and "3801," the number of the coat.' The officer made a notation of these marks at the time. Pillow died before the trial. The defendant offered evidence in support of his plea of alibi.

"1. Appellant assigns as error the admission in evidence or the statement made by Pillow in the presence of the defendant. In *State* v. *Goldfeder* (Mo Sup), 242 SW 403, 404, David E. Blair, J., said:

" 'It has been repeatedly ruled by this Court that, when one is under arrest charged with a crime, he is under no duty to make any statement concerning the crime with which he stands charged. He is then under no duty to deny any charges made against him, and statements tending to implicate him, made in his presence and hearing by others at such time and under such circumstances, and not denied by him, are not admissible in evidence against him on the trial.'

"This has long been the rule in this and other jurisdictions, as shown by the cases cited in the opinion. This humane rule has higher sanction than mere judicial precedent. At the trial of Jesus before the Sanhedrin, we read:

" '59. Now the chief priests and elders, and all the council, sought false witness against Jesus, to put Him to death;

" '60. But found none; yea, though many false witnesses came, yet found they none. At the last came two false witnesses.

" '61. And said, This fellow said, I am able to destroy the temple of God, and to build it in three days.

" '62. And the high priest arose, and said unto Him: Answerest Thou nothing? What is it which these witness against thee?

" '63. But Jesus held His peace.' "
— Matthew 26:59–63.

"When He was before Pilate:

" '11. And Jesus stood before the governor: and the governor asked Him, saying, Art Thou the King of the Jews? And Jesus said unto him, thou sayest.

" '12. And when He was accused of the chief priests and elders, He answered nothing.

" '13. Then said Pilate unto Him, Hearest Thou not how many things they witness against Thee?

" '14. And He answered them never a word; insomuch that the governor marveled greatly.'
— Matthew 27:11–14."

was ample, but there was little circumstantial evidence of premeditation and deliberation. We could not properly declare a belief beyond a reasonable doubt that the reading of Grey's formal statement did not contribute[8] to Rollins' conviction of first-degree murder.

There is no need to dwell on Rollins' atrocious behavior. He is, nevertheless, entitled to a new trial.

Reversed and remanded for a new trial.

All concurred.

---

[8] See footnotes 2 and 3 and accompanying text.