PEOPLE v DUBY

Docket No. 54713. Submitted July 13, 1982, at Lansing.—Decided
October 6, 1982. Leave to appeal applied for.

Vance Duby was convicted of two counts of first-degree murder,
two counts of assault with intent to murder, and felony-firearm,
Saginaw Circuit Court, Hazen R. Armstrong, J. The defendant
appeals alleging that (1) the trial court abused its discretion by
denying his motion for a change of venue because of extensive
pre-trial publicity, (2) the trial court abused its discretion by
denying his motion for a separate trial from a codefendant, (3)
he was denied his right to confront and cross-examine wit-
nesses against him because of the admission of evidence of his
codefendant's extrajudicial statements, and (4) the trial court
abused its discretion by admitting color photographs showing
shotgun wounds to two of the victims' heads. *Held:*

1. The trial court did not abuse its discretion in denying the
defendant's motion for a change of venue. Although there was
considerable adverse publicity and sensationalism there was
not such a strong community feeling or bitter prejudice as to
render it probable that the jury could not exclude preconceived
notions of guilt. There was no media harrassment of the jurors

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 390.
[2] 21 Am Jur 2d, Criminal Law §§ 389, 402.
  21A Am Jur 2d, Criminal Laqw § 688.
  Pretrial publicity in criminal case as ground for change of venue.
  33 ALR3d 17.
[3] 75 Am Jur 2d, Trial § 17 *et seq.*
[4] 75 Am Jur 2d, Trial § 21.
  Antagonistic defenses as ground for separate trials of codefendants
  in criminal case. 82 ALR3d 245.
[5] 29 Am Jur 2d, Evidence § 539.
  75 Am Jur 2d, Trial § 23.
  Right to severance where codefendant has incriminated himself. 54
  ALR2d 830.
[6] 29 Am Jur 2d, Evidence § 540.
[7] 29 Am Jur 2d, Evidence §§ 785-787, 790, 792.
  Admissibility of photograph of corpse in prosecution for homicide or
  civil action for causing death. 73 ALR2d 769.

at the trial and the court repeatedly cautioned the jurors during the voir dire and trial not to read media accounts or discuss the case with other persons. Any deep-seated community feeling against the defendant was not shared by the jury.

2. Because neither defendant nor his codefendant attempted to exculpate himself by accusing the other, the joint trial did not allow the prosecutor to pit one defendant against the other. While the defense of a third defendant who was tried separately was antogonistic to the defenses of Duby and the codefendant in the joint trial, the defenses of Duby and the codefendant tried with him were not antagonistic. Further, error requiring reversal did not occur when the fiancée of one of the victims sobbed loudly in the courtroom and thereafter attacked Duby's codefendant in the joint trial because although the jury heard the sobbing the attack occurred outside the jury's presence. .

3. Duby was denied the right of confrontation by the admission of the testimony of the witness who had been lodged with Duby's codefendant at a detention center. The witness's testimony regarding statements made by the codefendant regarding the criminal transaction clearly implicated Duby even though Duby's name was never specifically mentioned. Because the codefendant was not available to Duby for cross-examination, Dudy was denied the right of confrontation. That error was harmless, however. There was sufficient evidence of premeditation and deliberation to justify the convictions of first-degree murder without the witness's testimony.

4. The trial court did not abuse its discretion in admitting the photographs of the victims' heads into evidence because whether the defendants possessed the intent to kill was a material point in issue. The photographs, which showed that both victims were shot in the middle of the head, supported the prosecution's theory that the defendants took direct aim at the victims and refuted the defendants' claim that they were merely shooting at car windows to scare people.

Affirmed.

1. Criminal Law — Change of Venue.

    The denial of a motion for a change of venue in a criminal case is within the trial court's discretion; it is not an abuse of discretion for a trial court to defer determination on a request for a change of venue until jury selection has been attempted in the original county.

2. Criminal Law — Change of Venue — Pretrial Publicity.

    The existence of pretrial publicity does not by itself require a

change of venue; if jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court a change of venue is not necessary; for a change of venue to be required, the defendant must demonstrate that there has been a pattern of strong community feeling or bitter prejudice against him and that the publicity was so extensive and inflammatory that jurors could not remain impartial when exposed to it; the totality of the circumstances including the content of the news reports and the voir dire examination transcript should be evaluated on appeal in determining whether a defendant was deprived of a fair and impartial trial because of local prejudice.

3. CRIMINAL LAW — SEPARATE TRIALS.

Generally, a defendant does not have a right to a separate trial because a strong policy favors joint trials; a trial judge's decision regarding a defendant's motion for a separate trial should not be found to constitute an abuse of discretion unless there is an affirmative showing of prejudice to substantial rights of the accused.

4. CRIMINAL LAW — SEPARATE TRIALS.

A criminal defendant is entitled to a trial separate from a codefendant where his defenses and those of his codefendant are antagonistic.

5. CRIMINAL LAW — JOINT TRIALS — CODEFENDANT'S CONFESSION.

The admission of a non-testifying codefendant's confession implicating a defendant at a joint trial constitutes a denial of the right of confrontation where there is no effective means of examining the codefendant concerning the statement; cautionary instructions are insufficient to prevent jurors from considering powerfully incriminating extrajudicial statements by a codefendant with regard to another defendant, however, error does not automatically require reversal of an otherwise valid conviction because reversal is not warranted where the error was harmless beyond a reasonable doubt.

6. CRIMINAL LAW — JOINT TRIALS — CODEFENDANT'S CONFESSION.

It is accepted procedure in joint trials involving codefendants to allow a prosecutor to introduce a lawfully acquired confession of one of the defendants provided any reference to any of the other defendants is deleted or the other defendants are not clearly implicated by the confession.

7. CRIMINAL LAW — EVIDENCE — PHOTOGRAPHS.

The admission of photographic evidence is largely a matter addressed to the discretion of the trial court; review of the trial court's exercise of discretion is directed to ascertaining whether the admission of the photographs was substantially necessary or instructive to show material facts or conditions rather than merely calculated to excite passion or prejudice; photographs which are pertinent, relevant, competent, or material on any issue in the case should not be rendered inadmissible merely because they show the details of a gruesome or shocking crime; assuming the materiality of photographs, a trial court should still weigh the potential prejudicial effect against probative value.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert L. Kaczmarek,* Prosecuting Attorney, and *Kay F. Pearson,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Terence R. Flanagan),* for defendant on appeal.

Before: ALLEN, P.J., and CYNAR and R. B. MARTIN,* JJ.

PER CURIAM. Defendant was jointly tried and convicted with Richard Musselman of two counts of first-degree murder, MCL 750.316; MSA 28.548, two counts of assault with intent to murder, MCL 750.83; MSA 28.278, and felony-firearm, MCL 750.227b; MSA 28.424(2). He was sentenced to concurrent life terms of imprisonment on the first four counts and a consecutive two-year term on the felony-firearm conviction.

The charges against defendant Duby, codefendant Musselman, and Harry Varney, who was tried separately, stem from a shooting spree in the Saginaw area during the early morning hours of January 3, 1980. As a result of the spree, Alvin

* Circuit judge, sitting on the Court of Appeals by assignment.

Swiney and Ralph Minerd were dead and Steve Miller and Meridith Davis had been assaulted. The shootings had racial overtones since three of the four victims were black and all three defendants were white.

Defendant took the stand and testified that on January 2, 1980, he, Musselman, and Varney were at Musselman's house smoking marijuana and drinking whiskey and beer. Around midnight, defendant took a 12-gauge shotgun and three shells, belonging to his brother, from his house. In his green Nova, defendant, Musselman, Varney, and another youth drove to Shiawassee Flats to "shine" deer. After shining deer, defendant took the fourth youth home. Defendant, Musselman, and Varney returned to Musselman's house where Musselman got more shotgun shells and, with defendant driving, they set out to shine deer again. However, as they were driving, Musselman and Varney talked about scaring a car, which defendant understood to mean shooting at its windows. As defendant drove past cars, Musselman shot at the cars, and the three laughed as they drove away, thinking they had scared the drivers. Defendant said he was unaware that anyone had been injured by any of the shootings. Musselman did not testify.

Defendant appeals as of right, raising the following four issues.

## I

### DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A CHANGE OF VENUE BECAUSE OF EXTENSIVE PRE-TRIAL PUBLICITY?

Prior to trial, defense counsel moved for a

change of venue, claiming that pre-trial publicity prevented a fair trial. The court denied the motion, stating that an attempt would be made to impanel a jury in Saginaw County and, if it appeared that a jury could not be obtained, the motion could be renewed at that time.

A trial court's determination on a motion for change of venue is reviewed for an abuse of discretion. *People v Prast (On Rehearing)*, 114 Mich App 469; 319 NW2d 627 (1982); *People v Swift*, 172 Mich 473; 138 NW 662 (1912). It is appropriate for the trial court to reserve a decision on a request for a change of venue until jury selection has been attempted in the original county. *People v Prast, supra; People v Collins*, 43 Mich App 259, 262; 204 NW2d 290 (1972), *cert den* 419 US 866; 95 S Ct 121; 42 L Ed 2d 103 (1974).

The existence of pre-trial publicity does not by itself require a change of venue. *People v Prast, supra; People v Marsh*, 108 Mich App 659, 669; 311 NW2d 130 (1981). A change of venue is not necessary even though jurors have been exposed to adverse publicity and hold preconceived notions of guilt or innocence, if they can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Irvin v Dowd*, 366 US 717; 81 S Ct 1639; 6 L Ed 2d 751 (1961); *People v Marsh, supra*, 667-668.

The burden rests on the defendant to show the existence of actual prejudice or the presence of strong community feeling or a pattern of deep and bitter prejudice so as to render it probable that the jurors could not exclude preconceived notions of guilt, notwithstanding their statements of impartiality. *Irvin v Dowd, supra; Sheppard v Maxwell*,

384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966); *People v Bloom,* 15 Mich App 463; 166 NW2d 691 (1969). The totality of the circumstances, including the content of the news reports and the voir dire examination transcript, must be evaluated on appeal in determining whether a defendant was deprived of a fair and impartial trial because of local prejudice. *Irvin v Dowd, supra,* 366 US 717, 723; *Sheppard v Maxwell, supra,* 384 US 333, 362.

On appeal, defendant makes no claim of identifiable prejudice, and our review of the voir dire examination transcript shows no such prejudice. The jury was selected over a period of four days, and the voir dire examination transcript was 536 pages long. After general questioning of the entire venire panel, each prospective juror was examined individually by the trial court, the prosecutor, and both defense attorneys concerning his exposure to adverse publicity and its effect on his ability to render an impartial verdict. Of the 12 jurors who deliberated the case, 2 had never heard of the case, and 7 of the remaining 10 jurors read about the killings at the time of their occurrence in January, 1980, and remembered little about the case. Upon questioning, each of the jurors said that he had not formed a preconceived or fixed opinion or impression of the defendant's guilt or innocence and could render a fair and impartial verdict based on the evidence offered at trial.

Defendant argues that even though every juror who had been exposed to publicity stated that he or she could render a verdict based on the evidence offered at trial, pre-trial media coverage was so extensive and inflammatory as to give rise to a strong community prejudice which was too great to ignore.

Numerous reports about the shootings were carried by local newspapers, radio, and television stations.[1] The killings were characterized as "wanton", "homicidal craziness", and a "drunken 'spur-of-the-moment whim' ". Statements by Varney and Musselman to others were published, which indicated defendant's participation in the crime, including a statement made by Musselman to a detainee in the youth center that the trio had been sitting in Musselman's home getting high and planned to go shooting at black motorists. There were also numerous psychological profiles of Musselman, who was labeled as a triggerman, troublemaker, alcoholic, drug user, illegitimate, and sociopath with long-standing emotional problems who once told his teacher that he did not need to learn to read because he was going to murder a man and be sent to prison. While the focus of the publicity was on Musselman, defendant emphasizes that his fate was intertwined with Musselman's, especially in light of the court's refusal to grant defendant a separate trial. The *Saginaw News* also ran the results of a poll which asked, "Do you believe the person charged in the recent shotgun slayings could get a fair trial in Saginaw?". While 70% of the 344 readers said yes, the yes comments included: "It doesn't really make any difference. The way our judicial system works, their lawyers will find some way to get them off the hook. * * * No matter what the verdict the jury gave, the judge would lighten the sentence and the parole would let them back on the streets. * * * Thanks to the News articles, it will have to go to another county and cost the taxpayers a lot of extra money."

---

[1] Defendant's brief listed 70 television stories appearing either on WNEM-TV 5 in Bay City/Saginaw or WJRT-TV 12 in Flint, and 41 news articles, apparently all from the *Saginaw News.*

Although there was considerable adverse publicity and sensationalism, we do not find the presence of such a strong community feeling or bitter prejudice as to render it probable that the jury could not exclude preconceived notions of guilt. Much of the pre-trial publicity occurred in January, 1980, when the crimes were committed, and then again during the trial. There was no media harrassment of the jurors at the trial, and the court repeatedly cautioned the jurors during the voir dire and trial not to read media accounts or discuss the case with others. Any deep-seated community feeling against defendant was not shared by the jury. Of 70 prospective jurors examined, only seven percent indicated that they could not render a fair and impartial verdict. By the time of trial, which was held six months after the occurrence of the crime, the impanelled jurors only vaguely remembered the news account, and each juror denied any preconceived impression of the defendant's guilt or innocence. We find no abuse of discretion.

## II

### DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A SEPARATE TRIAL?

Both Duby's and Musselman's attorneys moved several times for a trial separate from Varney's and from each other's. While the prosecutor initially wanted all three defendants tried together, on the first day of trial the prosecutor requested severance for Varney's trial, since references from Varney's pre-trial statement which implicated the other codefendants could not be deleted without destroying the meaning of the statement, and Varney's trial was severed.

A trial judge's decision on a motion for separate trials is reviewed for an abuse of discretion. MCL 768.5; MSA 28.1028; *People v Harris,* 110 Mich App 636, 649; 313 NW2d 354 (1981). Since a strong policy favors joint trials, generally a defendant does not have a right to a separate trial. *People v Harris, supra,* 648-649; *People v Carroll,* 396 Mich 408, 414; 240 NW2d 722 (1976). There must be an affirmative showing of prejudice to substantial rights of the accused before an abuse of discretion will be found. *People v Schram,* 378 Mich 145, 156; 142 NW2d 662 (1966).

Defendant alleges three sources of prejudice arising from the joint trial. First, before trial and on appeal, defendant argued that he was denied a fair trial because antagonistic and inconsistent defenses were offered by the two defendants. *People v Hurst,* 396 Mich 1, 6; 238 NW2d 6 (1976); *People v Aguilar,* 105 Mich App 258; 306 NW2d 472 (1981). However, our review of the motion and trial transcripts reveal that while Varney's defense was antagonistic to the other two defendants, Musselman's and Duby's defenses were the same, *viz.,* both participated in the shooting but neither intended to kill or injure the victims. Since neither defendant attempted to exculpate himself by accusing the other, the joint trial did not allow the prosecutor to pit one defendant against the other. *People v Hurst, supra.*

Next defendant claims prejudice from an emotional outburst which occurred in the jury's presence. During the first day of trial, Betty Stinger, an endorsed witness, entered the courtroom and began sobbing loudly. Ms. Stinger was the fiancée of victim Swiney, and was present in the car when he was killed. The trial judge immediately ordered the jury removed from the courtroom. As officers

attempted to escort Ms. Stinger from the court-
room she attacked codefendant Musselman. Defen-
dant claims prejudice arising from the incident
and argues it would never have occurred had he
been granted a separate trial.

We find that reversal is not warranted by this
unfortunate incident. At the time that the trial
court was called upon to exercise its discretion in
ruling for severance, this incident could not have
been predicted. Additionally, testimony from the
bailiff, who escorted the jury from the courtroom,
indicated that the jury only heard the crying and
did not see or hear the incident in which Ms.
Stinger attacked Musselman. The record shows
that counsel for both Duby and Musselman stated
that they were satisfied from the bailiff's testi-
mony that no harm resulted.

Finally, defendant argues that the trial court
abused its discretion by requiring a joint trial
since admission of several statements by Mussel-
man to witnesses who testified at trial infringed
upon his right to confront and cross-examine wit-
nesses against him and deprived him of a fair
trial. Since defendant's argument that the court
abused its discretion by requiring a joint trial in
light of the use of incriminating extrajudicial
statements and his claim that use of these state-
ments deprived him of his right of confrontation
are intertwined, we will address them together in
defendant's third claim of error.

### III
### WAS DEFENDANT DENIED HIS RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST HIM BY ADMISSION OF HIS CODEFENDANT'S EXTRAJUDICIAL STATEMENTS?

While defendant gave pre-trial statements to no

one, codefendant Musselman gave a number of statements to police officers and others. Four witnesses were presented by the prosecution whose testimony only applied to codefendant Musselman. Specific references to defendant's name had been deleted from the statements and the jury was repeatedly cautioned that the statements were only to be considered against Musselman.

In *Bruton v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968), the United States Supreme Court held that the admission of a non-testifying codefendant's confession implicating a defendant at a joint trial constituted a denial of the right of confrontation[2] when there is no effective means of examining the codefendant concerning the statement. The Court concluded that cautionary instructions are insufficient to prevent jurors from considering "powerfully incriminating extrajudicial statements" by a codefendant with regard to another defendant. See, also, *People v Harris, supra,* pp 650-651. However, *Bruton* error does not automatically require reversal of an otherwise valid conviction. Reversal is not warranted where the error is harmless beyond a reasonable doubt. *Harrington v California,* 395 US 250; 89 S Ct 1726; 23 L Ed 2d 284 (1969).

We find that defendant was not prejudiced by admission of statements by Musselman to Richard Bryce and Anthony Wilkins, in which Musselman admitted the shootings and admitted that it was defendant's brother's gun that they used, since these statements were entirely consistent with

[2] US Const, Am VI; Const 1963, art 1, § 20.

defendant's own testimony. Likewise, Musselman's taped confession admitted nothing more than defendant's testimony. Nor do we find prejudice to defendant from admission of Musselman's statement to Wilkins that he'd get off the hook for the killings by playing crazy.

The testimony of Glen Turner, however, presents a more difficult question. Turner was lodged at the Saginaw County detention center while Musselman was there awaiting his juvenile court waiver hearing. Before testifying, Turner was cautioned by the prosecution to mention no names other than Musselman's or the relationship between the defendants. The court cautioned the jury that the testimony was only to be used against Musselman.

Turner testified that Musselman had discussed the shootings with him in the recreation room of the detention center. The pertinent portion of Turner's testimony on direct examination was as follows:

"*Q.* Now, did Mr. Musselman tell you what he was doing before the shooting went down?
"*A.* Yes, sir.
"*Q.* What did he tell you?
"*A. They* was getting high.
"*Q.* What specifically did he say about what he was doing?
"*A. They* were—he was getting high.
"*Q.* And did he tell you where this was taking place?
"*A.* At his house.
"*Q.* Did he tell you what he—else took place at his house, if anything?
"*A. That they had planned to go out and shoot some niggers.*
"*Q.* What were his exact words that he used?

"*A.* That *him and others* had planned to go out *and shoot some niggers.*

"*Q.* Are those the words he used?

"*A.* Yes, sir.

"*Q.* What else did he tell you about what happened after they left the house?

"*A. They* went out ridin' around.

"*Q.* Did he tell you why they were riding around?

"*A.* To see if *they could find some niggers.*" (Emphasis added.)

We reject the prosecution's argument that *Bruton* error was avoided in the above testimony merely by omitting references to defendant. While in joint trials involving codefendants, deletion of the other codefendant's name from the testimony is usually sufficient to avoid *Bruton* error, *People v Miller,* 88 Mich App 210, 220-221; 276 NW2d 558 (1979), *rev'd on other grounds* 411 Mich 321; 307 NW2d 335 (1981); *People v Macklin,* 46 Mich App 297, 302; 208 NW2d 62 (1973), Turner's statement, which included the use of the word "they", clearly implicated defendant since he admitted that he was at Musselman's house getting "high" and that he participated in the shootings. Since codefendant Musselman was not available for cross-examination, we find that the rule of *Bruton* was violated.

Defendant argues that Turner's testimony that Musselman said "they planned to go out and shoot some niggers" was not harmless since it constituted direct evidence on the element of premeditation and deliberation. The prosecution argues that any error was harmless since there was sufficient evidence of premeditation and deliberation without the testimony of Glen Turner to justify the convictions of first-degree murder. Specifically, the prosecution cites the following evidence as clearly establishing a premeditated and deliberate plan to

kill blacks: (1) all the victims were black except one, who may have appeared black because of his heavy beard and because he sat high up in a truck, (2) two other potential victims, who were not attacked, were white, (3) to carry out the scheme defendant would drive up alongside a car and one of the passengers would shoot, (4) since the fatal shots were to the victims' heads, the shots must have been aimed. The prosecution also argues that even if the shooting of the first victim, Meredith Davis, for whom defendant was convicted of assault with intent to murder, was not premeditated, the second and third shootings of Alvin Swiney and Ralph Minerd, the deaths of whom resulted in defendant's convictions for first-degree murder, evidence premeditation and deliberation.

Though the issue is close, we agree with the prosecutor that the error was harmless. We reach this conclusion on grounds that even if Musselman's statements that "they" planned to shoot, or "they" planned to find, or "they" planned to go out and find "some niggers" are totally disregarded, or had never been said, the evidence presented at trial clearly established a pattern of planned intent to harm blacks. The proofs clearly showed that defendant drove his car alongside cars occupied by blacks so that a shot could be fired at virtually point-blank range. Had this happened but once, it conceivably could be excused as nothing more than an accident occurring when the intent was no more than to scare the occupants of the other vehicle. But here it happened three times. It is these repetitive instances of point-blank shooting which distinguish the instant situation from *People v Rollins,* 33 Mich App 1; 189 NW2d 716 (1971). In *Rollins,* the only direct evidence of intent to kill was the codefendant's state-

ment that after they had driven past the victim
and his friends who were standing on a traffic
island on Woodward Avenue, they decided to go
back and on the way back, Rollins said "he was
going to try his best to kill one of them." Apart
from that statement there was little circumstan-
tial evidence of premeditation and deliberation.
*Rollins* involved only one assault and, unlike the
situation here where there were repetitive as-
saults, there was no evidence of premeditation.
Likewise, the statement in *Rollins* was the state-
ment of the defendant himself, whereas in the
instant case, the statement in question was the
codefendant's.

## IV

### Did the Trial Court Abuse Its Discretion by Admitting Color Photographs Showing Shotgun Wounds to Two of the Victims' Heads?

Color photographs of the heads of the two de-
ceased victims, which were taken at the autopsy,
were admitted over counsel's strenuous objection.
The prosecutor justified the admissibility of the
pictures in the court below by arguing that they
showed the exact location of the wounds, support-
ing the state's theory that the defendants intended
to kill the victims, not merely to scare them. The
prosecution further argued that the jury should be
allowed to see the photographs because they were
relied on by the State Police Crime Laboratory
technician, who testified for the prosecution, in
determining the distances from which the victims
were shot.

Admission of photographic evidence rests within
the sound discretion of the trial court. *People v
Eddington,* 387 Mich 551, 562; 198 NW2d 297
(1972). On review, the Court must determine

whether the photographs were substantially necessary or instructive to show material facts or conditions or whether they were merely calculated to excite passion and prejudice. *People v Falkner,* 389 Mich 682, 685; 209 NW2d 193 (1973); *People v Rocha,* 110 Mich App 1, 13; 312 NW2d 657 (1981). The substantially necessary test is nearly the same as asking whether the evidence is helpful in throwing light on any material point in issue. *People v Browning,* 106 Mich App 516, 523; 308 NW2d 264 (1981). Photographs which are pertinent, relevant, competent, or material on any issue in the case are not rendered inadmissible merely because they show the details of a gruesome or shocking crime. *People v Fuzi #2,* 116 Mich App 277; 323 NW2d 358 (1982). Assuming the materiality of photographs, the trial court must still weigh the potential prejudicial effect against probative value. *People v Wallach,* 110 Mich App 37, 64, fn 6; 312 NW2d 387 (1981).

We are not persuaded that the trial court abused its discretion in admitting the photographs in the instant case. Whether defendants possessed the intent to kill was a material point in issue. The photographs, which showed that both victims were shot in the middle of the head, supported the prosecution's theory that defendants took direct aim at the victims, and thereby refuted defendant's claim that they were merely shooting car windows to scare people. Although the medical examiner testified about the location of the wounds, we find that admission of the photographs would further aid the jury in determining intent, and that the pictures were not so inflammatory as to require their exclusion.

Having found no reversible error on any of the issues raised, defendant's convictions are affirmed.

Affirmed.