## IRVIN *v.* DOWD, WARDEN.

No. 41.   Argued November 9, 1960.—
Decided June 5, 1961.

*James D. Lopp* and *Theodore Lockyear, Jr.* argued the cause for petitioner. With them on the brief was *James D. Nafe.*

*Richard M. Givan,* Assistant Attorney General of Indiana, argued the cause for respondent. With him on the brief was *Edwin K. Steers,* Attorney General.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a habeas corpus proceeding, brought to test the validity of petitioner's conviction of murder and sentence of death in the Circuit Court of Gibson County, Indiana. The Indiana Supreme Court affirmed the conviction in *Irvin* v. *State,* 236 Ind. 384, 139 N. E. 2d 898, and we denied direct review by certiorari "without prejudice to filing for federal habeas corpus after exhausting state remedies." 353 U. S. 948. Petitioner immediately

sought a writ of habeas corpus, under 28 U. S. C. § 2241,[1] in the District Court for the Northern District of Indiana, claiming that his conviction had been obtained in violation of the Fourteenth Amendment in that he did not receive a fair trial. That court dismissed the proceeding on the ground that petitioner had failed to exhaust his state remedies. 153 F. Supp. 531. On appeal, the Court of Appeals for the Seventh Circuit affirmed the dismissal. 251 F. 2d 548. We granted certiorari, 356 U. S. 948, and remanded to the Court of Appeals for decision on the merits or remand to the District Court for reconsideration. 359 U. S. 394. The Court of Appeals retained jurisdiction and decided the claim adversely to petitioner. 271 F. 2d 552. We granted certiorari, 361 U. S. 959.

As stated in the former opinion, 359 U. S., at 396–397:

> "The constitutional claim arises in this way. Six murders were committed in the vicinity of Evansville, Indiana, two in December 1954, and four in March 1955. The crimes, extensively covered by news media in the locality, aroused great excitement and indignation throughout Vanderburgh County, where Evansville is located, and adjoining Gibson County, a rural county of approximately 30,000 inhabitants. The petitioner was arrested on April 8, 1955. Shortly thereafter, the Prosecutor of Vanderburgh County and Evansville police officials issued press releases,

---

[1] Section 2241 provides in pertinent part:

"(a) Writs of habeas corpus may be granted by the . . . district courts . . . within their respective jurisdictions. . . .

.     .     .     .     .

"(c) The writ of habeas corpus shall not be extended to a prisoner unless . . .

.     .     .     .     .

"(3) He is in custody in violation of the Constitution or laws or treaties of the United States . . . ."

which were intensively publicized, stating that the petitioner had confessed to the six murders. The Vanderburgh County Grand Jury soon indicted the petitioner for the murder which resulted in his conviction. This was the murder of Whitney Wesley Kerr allegedly committed in Vanderburgh County on December 23, 1954. Counsel appointed to defend petitioner immediately sought a change of venue from Vanderburgh County, which was granted, but to adjoining Gibson County. Alleging that the widespread and inflammatory publicity had also highly prejudiced the inhabitants of Gibson County against the petitioner, counsel, on October 29, 1955, sought another change of venue, from Gibson County to a county sufficiently removed from the Evansville locality that a fair trial would not be prejudiced. The motion was denied, apparently because the pertinent Indiana statute allows only a single change of venue."

During the course of the *voir dire* examination, which lasted some four weeks, petitioner filed two more motions for a change of venue and eight motions for continuances. All were denied.

At the outset we are met with the Indiana statute providing that only one change of venue shall be granted "from the county" wherein the offense was committed.[2] Since petitioner had already been afforded one change of venue, and had been denied further changes solely on the basis of the statute, he attacked its constitutionality. The

---

[2] Burns' Ind. Stat. Ann., 1956 Replacement Vol., § 9–1305, provides in pertinent part: "When affidavits for a change of venue are founded upon excitement or prejudice in the county against the defendant, the court, in all cases not punishable by death, may, in its discretion, and in all cases punishable by death, shall grant a change of venue to the most convenient county. . . . Provided, however, That only one [1] change of venue from the judge and only one [1] change from the county shall be granted."

Court of Appeals upheld its validity. However, in the light of *Gannon* v. *Porter Circuit Court*, 239 Ind. 637, 159 N. E. 2d 713, we do not believe that argument poses a serious problem. There the Indiana Supreme Court held that if it was "made to appear after attempt has actually been made to secure an impartial jury that such jury could not be obtained in the county of present venue . . . it becomes the duty of the judiciary to provide to every accused a public trial by an impartial jury, even though to do so the court must grant a second change of venue and thus contravene [the statute] . . . ." 239 Ind., at 642, 159 N. E. 2d, at 715. The prosecution attempts to distinguish that case on the ground that the District Attorney there conceded that a fair trial could not be had in La Porte County and that the court, therefore, properly ordered a second change of venue despite the language of the statute. Inasmuch as the statute says nothing of concessions, we do not believe that the Indiana Supreme Court conditions the duty of the judiciary to transfer a case to another county solely upon the representation by the prosecutor—regardless of the trial court's own estimate of local conditions— that an impartial jury may not be impaneled. As we read *Gannon,* it stands for the proposition that the necessity for transfer will depend upon the totality of the surrounding facts. Under this construction the statute is not, on its face, subject to attack on due process grounds.

England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much American as it was once the most English. Although this Court has said that the Fourteenth Amendment does not demand the use of jury trials in a State's criminal procedure, *Fay* v. *New York*, 332 U. S. 261; *Palko* v. *Connecticut*, 302 U. S. 319, every State has constitutionally provided trial by

jury.   See Columbia University Legislative Drafting Research Fund, Index Digest of State Constitutions, 578–579 (1959). In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.   The failure to accord an accused a fair hearing violates even the minimal standards of due process.   *In re Oliver*, 333 U. S. 257; *Tumey* v. *Ohio*, 273 U. S. 510.   "A fair trial in a fair tribunal is a basic requirement of due process."   *In re Murchison*, 349 U. S. 133, 136.   In the ultimate analysis, only the jury can strip a man of his liberty or his life.   In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne."   Co. Litt. 155b.   His verdict must be based upon the evidence developed at the trial.   Cf. *Thompson* v. *City of Louisville*, 362 U. S. 199.   This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.   It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).[3]   "The theory of the law is that a juror who has formed an opinion cannot be impartial."   *Reynolds* v. *United States*, 98 U. S. 145, 155.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved.   In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

---

[3] "[L]ight impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force, do constitute a sufficient objection to him."

This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies* v. *Illinois,* 123 U. S. 131; *Holt* v. *United States,* 218 U. S. 245; *Reynolds* v. *United States, supra.*

The adoption of such a rule, however, "cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Lisenba* v. *California,* 314 U. S. 219, 236. As stated in *Reynolds,* the test is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . ." At p. 156. "The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed." At p. 157. As was stated in *Brown* v. *Allen,* 344 U. S. 443, 507, the "so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." It was, therefore, the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors.

The rule was established in *Reynolds* that "[t]he finding of the trial court upon that issue [the force of a prospective juror's opinion] ought not be set aside by a reviewing court, unless the error is manifest." 98 U. S., at

156.   In later cases this Court revisited *Reynolds,* citing it in each instance for the proposition that findings of impartiality should be set aside only where prejudice is "manifest."   *Holt* v. *United States, supra; Spies* v. *Illinois, supra; Hopt* v. *Utah,* 120 U. S. 430.   Indiana agrees that a trial by jurors having a fixed, preconceived opinion of the accused's guilt would be a denial of due process, but points out that the *voir dire* examination discloses that each juror qualified under the applicable Indiana statute.[4] It is true that the presiding judge personally examined those members of the jury panel whom petitioner, having no more peremptory challenges, insisted should be excused for cause, and that each indicated that notwithstanding his opinion he could render an impartial verdict.   But as Chief Justice Hughes observed in *United States* v. *Wood,* 299 U. S. 123, 145–146: "Impartiality is not a technical conception.   It is a state of mind.   For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and

---

[4] "Challenges for cause.—The following shall be good causes for challenge to any person called as a juror in any criminal trial:

"Second. That he has formed or expressed an opinion as to the guilt or innocence of the defendant.   But if a person called as a juror states that he has formed or expressed an opinion as to the guilt or innocence of the defendant, the court or the parties shall thereupon proceed to examine such juror on oath as to the ground of such opinion; and if it appears to have been founded upon reading newspaper statements, communications, comments or reports, or upon rumors or hearsay, and not upon conversation with witnesses of the transaction, or reading reports of their testimony, or hearing them testify, and the juror states on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case."   Burns' Ind. Stat. Ann., 1956 Replacement Vol., § 9–1504.

procedure is not chained to any ancient and artificial formula."

Here the build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing. For example, petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the *cause célèbre* of this small community— so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a

99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the *modus operandi* of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as the "confessed slayer of six," a parole violator and fraudulent-check artist. Petitioner's court-appointed counsel was quoted as having received "much criticism over being Irvin's counsel" and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case). as well as "the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky."

It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County. In fact, on the second day devoted to the selection of the jury, the newspapers reported that "strong feelings, often bitter and angry, rumbled to the surface," and that "the extent to which the multiple murders—three in one family—have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions. . . ." A few days later the feeling was

described as "a pattern of deep and bitter prejudice against the former pipe-fitter." Spectator comments, as printed by the newspapers, were "my mind is made up"; "I think he is guilty"; and "he should be hanged."

Finally, and with remarkable understatement, the headlines reported that "impartial jurors are hard to find." The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State; 12 persons and two alternates were selected as jurors and the rest were excused on personal grounds, e. g., deafness, doctor's orders, etc. An examination of the 2,783-page *voir dire* record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury.

Here the "pattern of deep and bitter prejudice" shown to be present throughout the community, cf. *Stroble* v. *California,* 343 U. S. 181, was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. See *Delaney* v. *United States,* 199 F. 2d 107. Where one's life is at stake—and accounting for the frail-

ties of human nature—we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards. Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief. One said that he "could not . . . give the defendant the benefit of the doubt that he is innocent." Another stated that he had a "somewhat" certain fixed opinion as to petitioner's guilt. No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt. *Stroble* v. *California,* 343 U. S. 181; *Shepherd* v. *Florida,* 341 U. S. 50 (concurring opinion); *Moore* v. *Dempsey,* 261 U. S. 86.

Petitioner's detention and sentence of death pursuant to the void judgment is in violation of the Constitution of the United States and he is therefore entitled to be freed therefrom. The judgments of the Court of Appeals and the District Court are vacated and the case remanded to the latter. However, petitioner is still subject to custody under the indictment filed by the State of Indiana in the Circuit Court of Gibson County charging him with murder in the first degree and may be tried on this or another indictment. The District Court has power, in a habeas corpus proceeding, to "dispose of the

matter as law and justice require." 28 U. S. C. § 2243.
Under the predecessors of this section, "this Court has
often delayed the discharge of the petitioner for such rea-
sonable time as may be necessary to have him taken before
the court where the judgment was rendered, that defects
which render discharge necessary may be corrected."
*Mahler* v. *Eby,* 264 U. S. 32, 46. Therefore, on remand,
the District Court should enter such orders as are appro-
priate and consistent with this opinion, cf. *Grand-
singer* v. *Bovey,* 153 F. Supp. 201, 240, which allow the
State a reasonable time in which to retry petitioner. Cf.
*Chessman* v. *Teets,* 354 U. S. 156; *Dowd* v. *Cook,* 340 U. S.
206; *Tod* v. *Waldman,* 266 U. S. 113.

*Vacated and remanded.*

MR. JUSTICE FRANKFURTER, concurring.

Of course I agree with the Court's opinion. But this is,
unfortunately, not an isolated case that happened in
Evansville, Indiana, nor an atypical miscarriage of justice
due to anticipatory trial by newspapers instead of trial
in court before a jury.

More than one student of society has expressed the view
that not the least significant test of the quality of a
civilization is its treatment of those charged with crime,
particularly with offenses which arouse the passions of a
community. One of the rightful boasts of Western civili-
zation is that the State has the burden of establishing
guilt solely on the basis of evidence produced in court
and under circumstances assuring an accused all the safe-
guards of a fair procedure. These rudimentary conditions
for determining guilt are inevitably wanting if the jury
which is to sit in judgment on a fellow human being comes
to its task with its mind ineradicably poisoned against
him. How can fallible men and women reach a disin-
terested verdict based exclusively on what they heard
in court when, before they entered the jury box, their

minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

Not a Term passes without this Court being importuned to review convictions, had in States throughout the country, in which substantial claims are made that a jury trial has been distorted because of inflammatory newspaper accounts—too often, as in this case, with the prosecutor's collaboration—exerting pressures upon potential jurors before trial and even during the course of trial, thereby making it extremely difficult, if not impossible, to secure a jury capable of taking in, free of prepossessions, evidence submitted in open court. Indeed such extraneous influences, in violation of the decencies guaranteed by our Constitution, are sometimes so powerful that an accused is forced, as a practical matter, to forego trial by jury. See *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912, 915. For one reason or another this Court does not undertake to review all such envenomed state prosecutions. But, again and again, such disregard of fundamental fairness is so flagrant that the Court is compelled, as it was only a week ago, to reverse a conviction in which prejudicial newspaper intrusion has poisoned the outcome. *Janko* v. *United States, ante,* p. 716; see, *e. g., Marshall* v. *United States,* 360 U. S. 310. See also *Stroble* v. *California,* 343 U. S. 181, 198 (dissenting opinion); *Shepherd* v. *Florida,* 341 U. S. 50 (concurring opinion). This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade.