**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Albert GARZA, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Howard ZUMBERGE,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence CALDWELL,
Defendant-Appellant.**

**Nos. 79–1726 to 79–1728.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1981.

Decided Nov. 12, 1981.

Rehearing Denied Dec. 2, 1981.

Certiorari Denied March 1, 1982.
See 102 S.Ct. 1620.

Patrick Reardon, David L. Joslyn, Conklin & Adler Ltd., Chicago, Ill., for defendants-appellants.

Robert L. Simpkins, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before SPRECHER and BAUER, Circuit Judges, and DUMBAULD,* Senior District Judge.

BAUER, Circuit Judge.

Appellants were indicted and convicted on charges stemming from a prison escape incident. On appeal they challenge the trial court's rulings on a number of matters, including several pretrial and post-trial motions. We affirm.

## I

Lawrence Caldwell, Albert Garza, and Howard Zumberge were inmates of the federal penitentiary in Marion, Illinois. On February 14, 1979, under cover of thick fog, the trio attempted to escape from the institution by scaling its fences. Caldwell failed and was apprehended atop the inner perimeter fence; Garza and Zumberge succeeded and remained at large for several days. State and federal law enforcement officers finally captured Garza, after a brief gun battle, in a church basement. Zumberge was hiding in the same church but surrendered more peacefully. Zumberge was taken into custody and Garza was hospitalized for a gunshot wound.

All three were indicted on March 28, 1979. At trial, appellants elected to represent themselves *pro se*, although appointed counsel was available. They were acquitted on three counts and found guilty on the remaining counts.

## II

■ Appellants' initial contentions concern adverse pretrial publicity which they claim prejudiced the jury. Due process, of course, requires that an accused be tried by an impartial jury free from outside influences. *Maxwell v. Sheppard*, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Impartiality, however, does not mean complete juror ignorance of issues and events. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). If a juror can put aside his impressions gained from pretrial publicity and render a fair verdict based upon the evidence, the impartiality requirement is satisfied. *Dobbert v. Florida*, 432 U.S. 282, 302, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977); *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642; *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir. 1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). Where juror exposure to pretrial publicity can be shown, defendants must still demonstrate that actual prejudice resulted.[1] *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642; *United States v. Thompson*, 615 F.2d 329, 333 (5th Cir. 1980).

---

* The Honorable Edward Dumbauld, Senior Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

1. Prejudice is presumed in rare cases where pretrial publicity is pervasive and inflammatory. *See, e. g.*, *Maxwell v. Sheppard*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). But more often trials are deemed fair in spite of widespread publicity. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), and cases cited therein. Appellants failed to produce any newspaper article or other indicia of adverse pretrial publicity at trial, but did so in their reply brief on appeal. We have reviewed the newspaper clippings furnished us and find

■ After conducting our own independent review and evaluation of the trial court's voir dire examination, we perceive no actual prejudice arising from pretrial publicity. Although the record reveals that many potential jurors were familiar with the case, Judge Foreman's careful questioning and close scrutiny filtered out the biased veniremen.[2] Of those selected, only four jurors had read or heard of the case, and none possessed more than passing familiarity with the escape.[3] Under the circumstances, we cannot say the district court abused its discretion by its approach to the pretrial publicity problem.

■ Reflecting the same concern, appellants sought a change of venue as well as

additional peremptory challenges and challenges for cause, all of which were denied. Appellants, of course, claim these denials were erroneous. We disagree. As to the change of venue motion, the governing authority is rule 21(a), Fed.R.Crim.P., which provides, in part, that

[t]he court upon motion of the defendant shall transfer the proceeding as to him to another district . . . if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

Granting or denying a change of venue motion is within the trial court's discretion.

them largely factual and descriptive, rather than inflammatory. In addition, most of the articles appeared during or shortly after the period appellants escaped the Marion penitentiary, which was three months before the trial. Thereafter the media rarely discussed the case until a few days before the trial and even then the commentary was informational. At no time did the media create the circus-like atmosphere present in *Maxwell v. Sheppard*, 384 U.S. 333, 86 S.Ct. 1507 (1966).

2. To insure impartiality, Judge Foreman took the following steps: (1) initially determined the extent of media exposure to the venire panel; (2) individually questioned, out of the presence of the others, each exposed venireman; (3) extensively questioned each as to the extent and degree of publicity to which he was exposed; (4) elicited responses as to the partiality or impartiality of the venireman due to the publicity; and (5) excused for cause eleven veniremen who were opinionated.

3. Juror Barham's responses to Judge Foreman's questions illustrate the harmless, vague impressions held by the few jurors exposed to pretrial publicity.

The Court: Mr. Barham, where did you hear or read about this case before coming here today?

Mr. Barham: Read it in the Southern Illinoisian newspaper.

The Court: When did you do that, sir?

Mr. Barham: Right after it happened, I suppose. I don't remember the exact dates of it.

The Court: Did you read about it only the one time?

Mr. Barham: Seemed like there was two different articles, two or three different days.

The Court: Is that the only other time you have heard or read about it?

Mr. Barham: I heard them talk about it at the mines—some people that live down there—that area.

The Court: Did they purport to know something about the facts of the case or was it just conversation?

Mr. Barham: More or less just conversation and talk.

The Court: Did any of them purport to know anything about the facts of the case?

Mr. Barham: Well, I can't honestly say that they were talking facts. They were just talking in particular about the dogs they had and what not.

The Court: Would what you heard or read about, and here [sic] at this minute, would that tend to influence you in favor of these defendants or against these defendants or for or against the Government, Mr. Barham?

Mr. Barham: No sir, I don't think so.

The Court: Could you set that aside and reach a fair and impartial verdict in this case, based on what goes on only in this courtroom?

Mr. Barham: I think so.

The Court: Could you?

Mr. Barham: Yes, sir.

The Court: You understand that's what our aim is here, to get fair and impartial jurors, ones that will listen to only the evidence here in the courtroom totally uninfluenced by any other matters that they may have heard about this case?

Mr. Barham: Yes, sir.

The Court: You think you could do that?

Mr. Barham: I think I can, yes, sir.

Tr. of Jury Selection, at 108–09.

*United States v. Lamb*, 575 F.2d 1310, 1315 (10th Cir.), *cert. denied sub nom. Clary v. United States*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978). Appellants argue that there was more than a reasonable likelihood that prejudicial publicity would prevent a fair trial, but the record does not support them. Only a few articles appeared during the trial, few jurors had read or heard of the case, and no allegation is made that any jurors were actually influenced by media broadcasts or reports. Thus, a change of venue was properly denied.

■ Appellants' claims concerning additional juror challenges, predicated on supposed widespread, prejudicial publicity, are equally unfounded. As we have noted, there was some publicity, but it was hardly so inflammatory and prejudicial as to require any remedy beyond the measures taken by Judge Foreman.[4] Appellants contend that jurors Reed, Barham, Parker, and Waldron should have been excused for cause and that it was error to allow them on the jury. We disagree. The record shows that Reed read about the case and hunted in the area where Garza and Zumberge were captured, but could not recall any specifics. Barham, as we have demonstrated elsewhere,[5] only vaguely recollected the escape and, frankly, seemed more interested in the dogs used to track the appellants than in the appellants themselves. Parker merely had served as a juror on an unrelated murder case. Finally, Waldron's husband had been a prison guard in a state facility roughly sixteen years ago. Although from appellants' standpoint such jurors may not have been optimal, their presence did not constitute an abuse of discretion since each indicated that he or she could render an impartial verdict based upon the evidence.

■ We dispatch appellants' argument regarding additional peremptory challenges with the observation that such challenges are limited partly because they serve as a tactical tool of defense counsel seeking one biased juror almost as often as they serve to promote fair trials. *See Jeffers v. United States*, 451 F.Supp. 1338, 1353 (N.D.Ind. 1978). Here, as the government points out in its brief, there were only 30 veniremen remaining after challenges for cause, barely enough from which to select twelve jurors if each side exercised their eight peremptory challenges. Under these circumstances it was proper for the trial judge to deny additional peremptory challenges.

## II

Appellants next question certain evidentiary rulings which they claim prevented them from presenting a defense. At trial, appellants admitted they escaped, or attempted to escape,[6] so the sole issue became whether they were compelled to do so by prison conditions. They hoped to prove their defense of duress or necessity[7] by presenting witnesses who would testify, in effect, that violence between inmate factions, as well as appellants' attempts at negotiations between these factions, endangered appellants' lives, and that inadequate medical treatment was damaging appellant

4. See note 2, *supra*.

5. See note 3, *supra*.

6. Caldwell did not escape but admitted his attempt to do so.

7. Although appellants did not distinguish duress from necessity, the Supreme Court recently noted the common law distinction between the two:

 Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils.

 *United States v. Bailey*, 444 U.S. 394, 409–10, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). As the *Bailey* Court pointed out, however, modern cases have tended to blur this distinction. 444 U.S. at 410, 100 S.Ct. at 634. We assume appellants were asserting the defense of duress since they feared harm at the hands of other inmates, including members of the so-called Mexican Mafia.

Caldwell's eyesight. In particular, appellants sought to subpoena twelve inmates from various correctional facilities across the country to testify about the threat warring factions within Marion penitentiary posed to appellants. Judge Foreman, however, only allowed appellants to subpoena seven inmates, all housed at Marion. In his opinion, the other five witnesses' testimony would have been cumulative and their presence would have required unnecessary transportation expenses and delay.

We recognize that rule 17(b), Fed.R.Crim.P., requires a court to subpoena witnesses for indigent defendants, but only where "the presence of the witnesses is necessary to an adequate defense." In deciding whether a rule 17(b) subpoena should issue the trial judge has wide discretion. *United States v. Micklus*, 581 F.2d 612, 616 (7th Cir. 1978); *United States v. Greene*, 497 F.2d 1068, 1078 (7th Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Schultz*, 431 F.2d 907, 910 (8th Cir. 1970). We cannot conclude that Judge Foreman's refusal to call every requested inmate witness was an abuse of discretion. The witnesses appellants presented clearly established that appellants had acted as peace negotiators and that their lives, as a result, were endangered. Additional inmate witnesses would have done little to buttress appellants' position. Thus, it was well within the trial court's discretion to consider such testimony cumulative and unnecessary. Judge Foreman was equally justified in refusing to subpoena inmate witnesses to testify about prison medical conditions and appellant Caldwell's health problem. Qualified medical experts had covered the topic thoroughly; more prisoner testimony could add little or nothing, save perhaps delay.

Appellants also challenge the trial judge's exclusion of certain defense evidence which he deemed irrelevant. They sought to introduce testimony concerning two murders that occurred approximately three months before the escape, attempting to link the murders with their fear of harm and resulting compulsion to flee the prison. We believe the evidence was properly excluded. Even if we assume the circumstances surrounding the murders were somehow relevant to appellants' case, such evidence still could be excluded

> if its probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. The significant delay between the murders and the escape, by itself, suggests the limited probative value of the murder evidence. Quite apart from its doubtful probativeness, such evidence would have necessitated a trial within a trial just to prove certain inmates harmed others and now sought to harm appellants. Other defense witnesses already had established that appellants were in danger. Evidence of the murders probably would have confused the jurors and, in any event, was clearly cumulative. Appellants have failed to show an abuse of discretion here. *Harris v. Harvey*, 605 F.2d 330, 339 (7th Cir.), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1979).

### III

Appellants complain that the trial court failed to instruct the jury on their defense of duress, erroneously replacing it with the defense of coercion instead. In our view, the substituted instruction benefited appellants. Under the duress defense recently announced by the Supreme Court in *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), appellants would have been required to show: (1) that "an unlawful threat of imminent death or serious bodily injury ... caused [appellants] to engage in conduct violating the literal terms of the criminal law," *id.* at 409, 100 S.Ct. at 634; (2) that no reasonable, legal alternative to violating the law existed, *id.* at 410, 100 S.Ct. at 634; and (3) that appellants made "a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had

lost its coercive force," *id.* at 413, 100 S.Ct. at 636; *United States v. Trapnell*, 638 F.2d 1016, 1030 (7th Cir. 1980). Appellant Garza's rather hostile greeting to the police, complete with gunfire, tends to militate against any inference that appellants desired to report to authorities once safely beyond prison walls. Judge Foreman's instruction, given before the Supreme Court decided *Bailey*, only required appellants to show their escape was necessitated by a reasonable fear of present, immediate, serious bodily harm or death if they remained; it did not require any consideration of appellants' intent to return. Since the showing under Judge Foreman's instruction required less proof than that required by *Bailey*, the error favored appellants. We see no reversible error in the coercion instruction.

## IV

■ The fourth major argument pressed by appellants claims an equal protection violation because the Marion penitentiary's law library lacked sufficient resources for them to use in preparing an adequate defense. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court recognized that prisoners are entitled to access to adequate law libraries, but went on to say that meaningful access to the courts could be achieved by alternative means, such as the assistance of appointed counsel. 430 U.S. at 830, 97 S.Ct. at 1499. Here, appellants elected to proceed *pro se* even though appointed counsel stood by and assisted throughout the trial. Whatever research handicaps the Marion library imposed could easily have been overcome by simply directing appointed counsel to obtain the needed materials from a more complete law library. Therefore, no equal protection violation is present.

## V

■ Appellant Caldwell attacks the district court's refusal to sever his trial

from that of Garza and Zumberge. He claims, in essence, that he was prejudiced by the joint trial because he did not commit the same crime and, in particular, did not shoot any law enforcement officers. Severance rulings are committed to the trial judge's discretion and are not disturbed on appeal absent abuse, *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), so we must determine whether such abuse occurred here. Under rule 8(b), Fed.R.Crim.P., joinder in the same indictment is permitted where those accused "are alleged to have participated in the same act or transaction or in the same series of actions or transactions constituting an offense or offenses." *See, e. g., United States v. Green*, 561 F.2d 423, 426 (2d Cir. 1977), *cert. denied*, 434 U.S. 1018, 98 S.Ct. 739, 54 L.Ed.2d 764 (1978) (joinder permitted for series of bank robberies). Generally, the mere charging of a conspiracy count linking together substantive counts against various defendants fully satisfies rule 8(b)'s relatedness requirement and justifies joinder. *Schaffer v. United States*, 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960); *United States v. Valenzuela*, 596 F.2d 824, 829 (9th Cir.), *cert. denied sub nom. Lizarraga v. United States*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). Of course, bad faith allegations of conspiracy do not satisfy rule 8(b)'s requirements, *United States v. Valenzuela*, 596 F.2d at 829; *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir. 1971), but defendant bears the burden of establishing prosecutorial bad faith. *United States v. Luna*, 585 F.2d 1, 4 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); *United States v. Blitz*, 533 F.2d 1329, 1344 (2d Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976).[8]

■ In deciding whether to allow joinder of different defendants in a single trial we must balance the government's benefit in jointly trying related incidents

---

**8.** Although appellants characterize the conspiracy count as "improper," we will assume for purposes of our discussion that appellants intended to charge the government with bad faith.

and defendants against the prejudice to a defendant of possibly having multiple offenses and participants confused with each other. *United States v. Luna*, 585 F.2d at 4; *King v. United States*, 355 F.2d 700, 703 (1st Cir. 1966). Usually "joint trials are permitted to promote judicial economy in spite of the dangers that the jury will be influenced by all the evidence in ruling on each charge." *United States v. Bronco*, 597 F.2d 1300, 1303 (9th Cir. 1979). A review of the evidence in this case demonstrates that a sufficient factual basis existed to charge appellants, in good faith, with conspiracy. All three appellants sought to escape at the same place, on the same day, at the same time. Moreover, all three lived in the same unit and range at Marion. They even worked the same job at the same time within the prison. These facts clearly suggest that the conspiracy count was added in good faith.

 The Supreme Court has expressly refused to fashion a "hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law." *Schaffer v. United States*, 362 U.S. at 516, 80 S.Ct. at 948. But the *Schaffer* Court did emphasize that the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice appears. *Id.* We see no prejudice to Caldwell from the joint trial. The facts of this case were simple and far from confusing. Even the most unsophisticated juror could see that Caldwell failed to get beyond the prison fences. How any reasonable juror could think Caldwell committed a burglary, shot a sheriff, or in fact escaped, as Garza and Zumberge did, is beyond us. No abuse of discretion is shown.

### VI

We now turn to the last argument, that Garza's pretrial motion to suppress certain government evidence should have been granted. While in the hospital awaiting treatment for his gunshot wound, Garza was approached by a state laboratory examiner and Special Agent Donald Jones of the Federal Bureau of Investigation. The examiner was present to apply a chemical substance to Garza's hands to determine which hand fired the gun during the church basement gun battle. Just before the chemical application commenced, according to Agent Jones' testimony, Garza turned to Jones and asked what the examiner was doing in the emergency room. Jones responded that "[h]e's going to run a test on your hands to see which hand you used to fire the gun when you shot the sheriff." At first Garza turned away without comment, but as the examiner began applying the solution to Garza's hand Garza suddenly turned to Jones and stated, without provocation, that it was the right hand. Jones then asked if Garza was right-handed or left-handed, to which Garza responded "both." The examiner continued applying the solution and Garza once again turned to Jones and said, "he doesn't have to do that. I told you it was the right hand." Tr. at 310.

 Since *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it has been settled that a suspect in custody must be advised of his constitutional rights before interrogation can begin. It is equally settled, however, that "[a]ny statement given freely and voluntarily without any compelling influences is ... admissible in evidence." 384 U.S. at 478, 86 S.Ct. at 1630. This is especially true where such damaging statements are given by the accused on his own initiative. *United States v. Wood*, 545 F.2d 1124, 1127 (8th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Garza was alert and under no compulsion to speak. In fact, it seems clear to us that Garza initiated the entire conversation between himself and Agent Jones. We view his admissions about the gun as given voluntarily and conclude that no interrogation occurred. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1688–1689, 64 L.Ed.2d 297 (1980). This evidence was properly admitted.

### VII

For the foregoing reasons, appellants' convictions are

AFFIRMED.