**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John F. REYNOLDS,
Defendant-Appellant.**

No. 86–2327.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1987.

Decided June 9, 1987.

Rehearing and Rehearing En Banc
Denied Aug. 5, 1987.

Patrick J. Calihan, Chicago, Ill., for defendant-appellant.

Bradely E. Lerman, Asst. U.S. Atty., and Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is a "Greylord"[1] case, and the use, or nonuse, of that designation has caused the defendant to raise related issues concerning pretrial publicity, jury voir dire, and the resulting impact on the presenta-

---

1. "Greylord" is a term apparently coined by the government and widely used in the media to indicate a wide-ranging federal investigation and prosecution for corruption in Cook County, Illinois, of certain state court judges, court personnel and attorneys.

tion of defendant's defense.[2] On December 19, 1985, the defendant John Reynolds, former judge of the Circuit Court of Cook County, Illinois, was charged in a thirty-six count indictment with racketeering (18 U.S.C. § 1962(c)), racketeering conspiracy (18 U.S.C. § 1962(d)), mail fraud (18 U.S.C. § 1341), and making false statements on his federal income tax returns (26 U.S.C. § 7206(1)). On May 7, 1986, the jury returned a verdict of guilty on all counts.[3]

## I. FACTUAL BACKGROUND

Because the defendant does not challenge the sufficiency of the evidence or make other customary allegations of trial error, we discuss the facts briefly.

The defendant began the practice of law in 1958. Seven years later he became a magistrate for the Circuit Court of Cook County, Illinois. In 1976 he was elected a circuit court judge and thereafter served in various locations on various assignments until he resigned in 1984. From 1978 to 1981 the defendant presided over felony preliminary hearings in what is known as Branch 42 in the First Municipal District of the Circuit Court of Cook County. The defendant as judge considered issues of probable cause and suppression of evidence and accepted guilty pleas, but he held no trials.

Customarily, when bond was set for a defendant in the former judge's court a defendant needed to post only ten percent of the total amount in cash. That amount remained with the court until the case was concluded. A defendant then might be entitled to a refund of all or part of his cash deposit. A defendant, however, could choose to assign the bond refund to his attorney to apply to his legal fees. If a defendant made that choice, the judge could, at the appropriate time, order the refund paid to defendant's attorney. The possible availability of the cash bond refund for attorney's fees attracted attorneys who sought to convince unrepresented defendants to hire them. This practice of "hustling" for clients is contrary to both the rules of professional conduct for attorneys as well as the rules of judicial conduct. Judges who permit hustling violate the Standards of Judicial Conduct.[4]

The evidence clearly shows that the defendant not only permitted hustling, but encouraged it for his own extrajudicial profit, usually a one-third share. Sometimes the judge earned and collected a greater percentage, if, for instance, the judge accommodated an attorney by finding a lack of probable cause, or by vacating a bond forfeiture. Such special extra-judicial service could earn the judge as much as $1,000. Courtroom clerks assisted by steering unrepresented defendants to the lawyers who cooperated with the clerks by paying for this special service. In an effort to curtail hustling, the Chicago Bar Association ("CBA") assigned attorneys to various courtrooms to be available to represent defendants who did not qualify for a public defender. The defendant quickly ridded his courtroom of the CBA lawyers.

The grubby details of the defendant's judicial misconduct are described only to the extent necessary to understand the points the defendant endeavors to make. Attorneys Edward Nydam, Thomas Delbecarro, and Arthur Cirignani were hustlers.[5] Money was passed from hustlers to the judge in various ways: via a clerk, or placed by the hustler in the judge's desk, or coat, or handed to him directly. With his share of "hustle" money, as may be expect-

---

2. In prior cases, this court has disposed of a wide variety of defense attacks on "Greylord" prosecutions which the defendant does not seek to relitigate. See United States v. LeFevour, 798 F.2d 977 (7th Cir.1986); United States v. Devine, 787 F.2d 1086 (7th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 170, 93 L.Ed.2d 610 (1986); United States v. Conn, 769 F.2d 420 (7th Cir.1985); United States v. Murphy, 768 F.2d 1518 (7th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

3. The defendant was sentenced to ten years imprisonment and ordered to forfeit $33,000.

4. Ill.Sup.Ct.R. 61(c)(10).

5. "Hustler" Delbecarro, for example, made a substantial profit from this unethical practice. Between January 1979 and June 1980 he received over $100,000 from the bond refunds.

ed, the defendant often handled his personal expenses with large amounts of cash. The defendant kept a record of what the hustlers owed him and did not shrink from asking them to pay up. The hustlers, after making agreements with the government, turned against the defendant, as did the court clerks in exchange for promises of immunity.

The defendant called as witnesses three court reporters, three attorneys, and a probation officer who had worked in Branch 42 during the defendant's tenure, all of whom denied knowing that the defendant profited from hustling. The defendant also called a financial analyst in an attempt to show that the hustlers could not have paid the defendant the amounts claimed, but the analysis was shown to be incomplete and flawed. The defendant, who testified in his own behalf, denied receiving any payments from hustling activities and endeavored to explain his numerous cash transactions.

## II. ISSUES ON APPEAL

The issues on appeal all involve restrictions imposed by the trial court upon the voir dire examination of the jury, and the court's pretrial ruling that the parties were barred from using the term "Greylord." The term "Greylord" was and still is widely used in the media to refer to the federal investigation of corruption in and around the state courts of Cook County. Publicity has been considerable. The problem the parties and the court faced was how to select an impartial and untainted jury, and then to conduct a trial without outside and improper influences.

One might expect all parties to have agreed that the term "Greylord" should be avoided because the press revelations of corruption might prejudice the trial of this particular defendant, a target of the Greylord investigation. That, however, was not the perspective of defendant's trial counsel, who sought on voir dire to explore the impact of Greylord publicity, and to use Greylord's investigative focus on judges as a part of the defense.

Defense counsel explained his position to the trial judge claiming that every prospective juror would have heard about Greylord, although possibly not about this particular defendant. The problem, as defense counsel saw it, was how to determine whether the prospective jurors had been so tainted by the Greylord publicity as to hold fixed opinions. When the trial judge first suggested that it might not be necessary to use the term "Greylord," defense counsel cautioned that it was inevitable that in the course of the proceedings the broader Greylord investigation would somehow be injected. Defense counsel further explained that the Greylord investigation was itself to be the focus of the defense. Rather than trying to distance his client from the larger Greylord investigation, defense counsel intended to try to turn Greylord to his advantage. He planned to establish how the investigation developed and why the government witnesses would testify as anticipated. Defense counsel explained that the label "Greylord" was derived from an old term for English judges which suggested that the investigation focused on the judges themselves and not on the peripheral people involved: the lawyers and clerks. Therefore, defense counsel's strategy was to attack the credibility of the government's witnesses, Greylord participants themselves, by emphasizing that the witnesses could benefit personally so long as they provided incriminating information on judges. Defense counsel argued that it was not sufficient to refer to a general investigation of the courts because it was focused on the judges. The trial judge expressed that his concern was "to neutralize the atmosphere in the courtroom so as to provide a fair trial to all parties." We recognize that this is a proper judicial function, but in this instance it was in some conflict with counsel's efforts in defense.

Voir dire began and was completed the same day under the judge's ban on the use of the term "Greylord." Problems arose between the trial judge and defense counsel, but the government was almost on the sidelines. For example, a problem arose during voir dire questioning of a prospective juror named Mathieson. Defense counsel asked Mathieson individually the

same question that originally had been put to all prospective jurors, "Have you read or heard anything about this case?" Mathieson responded that he had read or heard general information about cases of the same type in the last couple of years, but could not specifically recall anything about this particular case. Defense counsel understandably pursued the matter, inquiring as to whether what Mathieson may have heard or read about similar cases had in any way caused him to have a view about cases of this type. Mathieson answered that usually he thought about what he read as he read it, and would have formed a view about it, but it was so long ago he could not remember what his view may have been. Defense counsel then inquired how that might affect Mathieson now as a juror. Mathieson responded that he only had background information and he did not see how that would affect him. Defense counsel asked when the last time was that Mathieson had read or heard anything about similar cases. The trial judge called a sidebar and advised defense counsel that he would not permit this type of prospective juror "cross-examination." The trial judge warned that he would take over voir dire himself because he was concerned about the impact this continued probing would have on the rest of the panel. Defense counsel suggested that Mathieson be further examined separately on the matter. The trial judge inquired what defense counsel wanted him to do: make some other general statement, or speak about Greylord in some general way? Defense counsel reminded the court that he had originally wanted to be able to ask if prospective jurors had ever heard of Greylord and suggested that each prospect may have to be questioned separately. The trial judge maintained his ruling about not "cross-examining" prospective jurors, and declined to privately interrogate each prospective juror at sidebar.

Voir dire continued. Later, defense counsel asked for a sidebar to reargue his point for individual voir dire because four prospects conceded having heard about similar cases. One said that he had heard about the particular defendant. The trial judge agreed to call those four outside the presence of the other prospective jurors. Prospective juror Poremba was called first, and told the judge that he had seen the defendant's name in the newspapers and something about Greylord, but that he had not paid much attention. The trial judge inquired if what he had read might affect his judgment or make it difficult to be a fair and impartial juror. Poremba answered that it might cause some prejudice. Poremba added that he could not say for sure that he could be the kind of juror the court was seeking, and the judge promptly excused him. Defense counsel commented to the trial judge, "See?"

The trial judge expressed concern that he might be intimidating the jurors, and that what inquiry there had already been was sufficient. Defense counsel then challenged for cause two other prospective jurors who had heard about similar cases and for whom the judge would allow no further opportunity for individual questioning. The judge denied those challenges for cause.

## III.  ANALYSIS

The defendant uses the forgoing summaries of selective portions of the voir dire record to argue that his sixth amendment right to an impartial jury, as well as his fifth amendment due process right to an impartial jury, were violated by the voir dire limitations the trial court imposed. The defendant argues that the trial court failed to conduct or permit the type of voir dire which would delve into the possibility of whether each venireman could put aside any preexisting impressions caused by the pre-trial publicity. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Garza*, 664 F.2d 135 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). The defendant further argues that the restricted voir dire adversely affected defendant's determination of which veniremen should be excused for cause as well as his informed use of peremptory challenges, relying on *United States v. Blanton*, 700 F.2d 298, 302–10, *vacated sub nom., United*

*States v. Allen,* 703 F.2d 981, *on rehearing,* 719 F.2d 815 (6th Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984); and *United States v. Dellinger,* 472 F.2d 340 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

Before we turn to a discussion of those cases, however, we must take a broader look at the voir dire than does the defendant. The trial judge began the voir dire examination with the usual general inquiries, but also inquired specifically if any of the jurors were familiar with the facts of this particular case, knew the defendant or his counsel, or knew anything about this particular case or parties that would make it difficult to be fair and impartial. The trial judge also inquired as to whether there was anything about the defendant being a judge, or anything about the publicity given to this or to similar cases that would cause the juror any difficulty in being fair and impartial.[6] No prospective juror indicated that he or she would have any such difficulties.

At the conclusion of the district court's own voir dire, counsel for the government and the defendant were each permitted to voir dire directly. Defense counsel covered everything from hobbies and favorite television programs to how the prospective juror acquired his news. We assume that this broad range of questions had some significance to the defendant. Beyond that type of inquiry, however, defense counsel asked each prospective juror if he or she had read or heard anything about this defendant's case. Only two of thirty-eight prospective jurors answered that they had read or heard of the defendant's case and both were then excused for cause, one being Poremba, whose voir dire we have already examined. Another had read about similar cases and indicated a possible bias and was likewise excused for cause.[7] Five prospective jurors responded that they had read or heard only of similar cases. Defense counsel examined them regarding their ability to be fair and impartial regardless of any knowledge they might have about other cases. Two of these five were accepted for the jury. It can be seen that between the court and counsel the subject was well covered without calling it Greylord.

Among other cases, the government cites *Irvin, Garza, Blanton* and *Dellinger,* as does the defendant, but the government points out that in *Blanton,* in an *en banc* opinion, 719 F.2d 815 (6th Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984), the court set aside the panel opinion on which the defendant relies and upheld the voir dire examination. Blanton was the former state governor of Tennessee and his indictment for corruption generated massive publicity. The *en banc* majority held that the trial judge did not abuse his discretion in conducting the voir dire to all prospective jurors *en masse.* The trial judge, taking note of the publicity about the case, had inquired whether the prospective jurors could put out of their minds what they may have seen or heard and decide the case on the facts addressed at trial and the appropriate law. Thirteen of the prospective jurors responded negatively and were excused. The Sixth Circuit deemed this to be sufficient and within the trial judge's discretion even though neither the judge nor the defense counsel examined individual jurors concerning specific instances of possible prejudicial media influence. In this case, between the efforts of the trial judge and defense counsel, a much more extensive voir dire occurred than in *Blanton.*

*Dellinger,* which involved the deep passions of the anti-Vietnam War movement, also does not help defendant. Its announced test for a voir dire's validity is "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." 472 F.2d at 367 (7th Cir.1972). Our court found the *Dellinger* voir dire

---

6. Information about the nature, extent and content of the publicity relating to this case or similar cases does not appear in the record, but it is accepted that there was wide publicity.

7. Other prospective jurors were excused for causes unrelated to the issues on this appeal.

inadequate because the trial judge permitted no questions which touched upon the influence of publicity, except indirectly by a general inquiry as to whether there was any reason the juror could not give the defendants a fair trial. What the trial judge permitted in this case far exceeds that which was found to be an abuse of discretion in *Dellinger.*

■ In *Garza* we reemphasized the necessity for an impartial jury, but noted that impartiality does not compel complete juror ignorance of issues and events. A juror need only be able to put aside impressions gained from publicity and decide the case on the evidence presented. 664 F.2d at 138 (7th Cir.1981). In addition, *Garza* requires that where juror exposure to pretrial publicity can be shown, the defendant must also demonstrate that actual prejudice resulted. *Id.* The defendant here responds that the voir dire in this case was so inadequate that prejudice cannot be determined. In view of the extent of the voir dire that was conducted, however, we are able to determine that a fair and impartial jury was constituted.

*Irvin* provides no solace to the defendant. 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In *Irvin,* the Supreme Court found the voir dire to be inadequate, but it was another extreme case. Six murders were committed in the vicinity of Evansville, Indiana, generating excitement and indignation throughout the area, which was reflected in the press. Eight of the twelve jurors who served on the jury admitted that they thought defendant was "guilty," but also indicated that in spite of that preexisting opinion they could render an impartial verdict. That situation obviously could not be viewed as conducive to a fair trial. Nothing in the present case is comparable to the situation in *Irvin.*

■ We find no reversible error. The defendant has not shown that the trial court clearly abused his discretion, *United States v. Banks,* 687 F.2d 967, 974 (7th Cir.1982), *cert. denied,* 459 U.S. 1212, 103

S.Ct. 1208, 75 L.Ed.2d 448 (1983), in not conducting or permitting the voir dire to the defendant's full satisfaction. As far as we can determine, the only specific voir dire questions on the publicity issue which the defendant submitted and the trial judge did not use were inquiries as to whether the prospective juror had heard of Greylord, and whether the prospective juror had an opinion about the government's investigation of the Circuit Court of Cook County. Those concerns were adequately covered by the use of other language in the voir dire inquiries.

The questioning of prospective juror Poremba at sidebar resulted in the court excusing him for cause, but that fact does not justify requiring the court to question each prospective juror in the same manner. The trial judge experimented with separate questioning and decided that it might intimidate the other prospective jurors and create additional problems. The prospective jurors responded adequately to the voir dire in each other's presence, and a sidebar thus was unnecessary. We have not mandated a sidebar procedure in similar circumstances. *See, e.g., United States v. Kampiles,* 609 F.2d 1233 (7th Cir.1979), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

Neither do we find any error in the trial court's attempt to avoid any prejudice by banning the use of the term "Greylord" during voir dire. If it had been used, the term could have tended to brand the defendant with all others charged with Greylord corruption. The use of the term proved to be unnecessary for voir dire purposes.

■ Nor do we find error in the trial judge's decision to restrict the use of the term "Greylord" at trial. The defendant argues that somehow the restriction foreclosed his defense because he planned to use the term as a means to attack the credibility and motivation of the government witnesses. Defense counsel's cross-examination of the government witnesses about their motivation in incriminating the

defendant judge in order to help their own cases was to the point and complete. Defense counsel does not appear to have been handicapped by not being able to use the term. Defense counsel did mention Greylord in his summation to the jury and others mentioned it several times during the trial.[8] Defense counsel strongly and credibly made his point to the jury in his closing argument.[9] The defendant was found guilty by a fair and impartial jury based on the abundant evidence offered at trial and the judge's instructions on the law (which the defendant does not question).

It is quite possible that the defendant could have had a fair trial before an impartial jury even if the defendant and the government had been allowed to spread the term "Greylord" on the record and to voir dire prospective jurors with its use, as defendant apparently desired. The trial judge, however, need not take his directions from defense counsel when exercising his own discretion in a conscientious attempt to conduct a fair trial in a difficult situation.

We find no reversible error, and affirm.

AFFIRMED.

---

**8.** The parties argue about who was responsible for the other mentions of "Greylord," but we need not resolve that side dispute. Defense counsel was free during trial to try to prevail on the court in any particular circumstance which arose to permit him some use of the term, but counsel did not make any such attempt.

**9.** In his closing defense counsel argued:
And I will tell you what happened, ladies and gentlemen of the jury, they decided that if they were going to get caught, they would have a story, and the story wouldn't be some little insignificant clerk, it would be the story of a judge, because if they were going to be able to give something to the Government, it would have to be what the government was interested in, and the Government was interested in judges.
There seems little more that any defense counsel could have said in an effort to make the point, even though the jury, in light of the overwhelming evidence, was not impressed.